UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALEX AROZ,

               Petitioner,

     v.

PATRICK COVELLO,

               Respondent.

No.  2:21-cv-1934 DJC CSK P

FINDINGS & RECOMMENDATIONS

## I.    INTRODUCTION[1]

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2016 conviction for forcible lewd acts on a minor under the age of 14 (Cal. Penal Code § 288(b)(1)), sexual penetration by a foreign object (Cal. Penal Code § 289(j)), sexual penetration of an unconscious person (Cal. Penal Code § 289(d)), and two counts of lewd acts on a minor under the age of 14 (Cal. Penal Code § 288(a)).  Petitioner is serving a sentence of 16 years imprisonment.

Petitioner raises the following claims: 1) claim 1: denial of right to counsel of choice; 2) claim 2: improper admission of prior uncharged sexual misconduct evidence; 3) claim 3: trial

---

[1] In these findings and recommendations, this Court refers to the victim ("T.L."), the victim's mother ("K.R.") and the three victims of the prior sexual misconduct ("R.B.," "A.T.," "K.G.") by their initials.

1

court erred in allowing prosecutor to ask expert witness hypothetical questions based on Child Sexual Abuse Accommodation Syndrome ("CSAAS"); 4) claim 4: violation of right to confrontation and ineffective assistance of counsel; 5) claim 5: ineffective assistance of counsel and violation of Miranda v. Arizona, 384 U.S. 436 (1966) ("Miranda"); 6) claims 6-14, 18, 20: ineffective assistance of counsel; 7) claim 15: ineffective assistance of counsel and violation of Brady v. Maryland, 373 U.S. 83, 87 (1963) ("Brady"); 8) claim 16: trial court erred in denying trial counsel's request to call Mike Martin as a witness; 9) claim 17: violation of Brady; and 10) claim 19: ineffective assistance of appellate counsel.  (ECF No. 9.)

After careful review of the record, this Court recommends that the petition be denied.

## II.    PROCEDURAL HISTORY

On March 2, 2016, after a trial in the Amador County Superior Court, a jury found petitioner guilty of forcible lewd acts upon a child, sexual penetration by a foreign object, sexual penetration of an unconscious person, and two counts of lewd acts upon a child.  (ECF No. 34-6 at 189-93.)  On February 24, 2017, the trial court sentenced petitioner to 16 years imprisonment.  (Id. at 264-65.)

Petitioner appealed his conviction to the California Court of Appeal.  (ECF No. 34-10.) Petitioner raised the following issues in his opening brief on appeal: 1) denial of right to counsel of choice; 2) trial court erred in allowing prosecutor to ask expert hypothetical questions based on CSAAS; and 3) improper admission of prior uncharged sexual misconduct evidence.  (Id.)  On August 21, 2020, the California Court of Appeal affirmed the judgment in a reasoned opinion. (ECF No. 26-13.)

Petitioner appealed to the California Supreme Court.  In his petition for review to the California Supreme Court, petitioner raised the same claims as raised in his opening brief.  (ECF No. 34-14.)  On October 28, 2020, the California Supreme Court denied petitioner's petition for review without comment or citation.  (ECF No. 34-15.)

Petitioner filed several habeas corpus petitions in state court.  Petitioner filed a habeas corpus petition in the Amador County Superior Court on October 27, 2016 alleging denial of access to the courts.  (ECF No. 34-16.)  The Amador County Superior Court denied this petition

2

1    on December 15, 2016.  (ECF No. 34-17.)

2           Petitioner filed a second habeas corpus petition in the Amador County Superior Court on

3    February 14, 2018 alleging denial of presentencing credits.  (ECF No. 34-18.)  The Amador

4    County Superior Court denied this petition on April 10, 2018.  (ECF No. 34-19.)

5           Petitioner filed a third habeas corpus petition in the Amador County Superior Court on

6    March 19, 2021 raising the following claims challenging the validity of his conviction:

7    1) violation of Miranda (claims one and two); 2) ineffective assistance of counsel based on

8    counsel's failure to object to admission of petitioner's statement as violating Miranda; 3)

9    ineffective assistance of counsel based on counsel's failure to subpoena phone records in support

10   of alibi defense; 4) ineffective assistance of counsel based on counsel's failure to subpoena video

11   evidence that would have impeached witness Melanie Keathley; 5) ineffective assistance of

12   counsel based on counsel's failure to subpoena witnesses who would have impeached witness

13   Keathley; 6) ineffective assistance of counsel based on counsel's failure to subpoena two

14   unidentified alibi witnesses; 7) ineffective assistance of counsel based on counsel's failure to

15   investigate video footage of petitioner stopping at gas station and bar;  8) ineffective assistance of

16   counsel based on counsel's failure to properly impeach witness Keathley with evidence that she

17   had motive to lie; 9) ineffective assistance of counsel based on counsel's failure to raise the issue

18   of "time of the alleged incident" in the filing of the information under California Penal Code

19   § 955; 10) ineffective assistance of counsel based on mistakes in opening statement; 11) Brady

20   and ineffective assistance of counsel claims based on failure to disclose if any compensation or

21   deal was made with witness Keathley; 12) trial court erred in not allowing Mike Martin to testify;

22   13) testimony of Officer Zaragoza violated Brady; 14) ineffective assistance of counsel based on

23   counsel's failure to investigate unidentified California Highway Patrol ("CHP") officer who

24   questioned petitioner; 15) ineffective assistance of counsel based on errors in closing argument;

25   16) ineffective assistance of appellate counsel based on failure to raise claims raised in instant

26   petition; and 17) ineffective assistance of trial and appellate counsel for failing to object to

27   expert's CSAAS testimony.  (ECF No. 34-20.)

28           The Amador County Superior Court denied petitioner's third habeas corpus petition on

3

June 9, 2021 on the following grounds: 1) the petition raised claims that could have been, but were not, raised on appeal; 2) the petition raised claims that were raised and rejected on appeal; and 3) petitioner failed to establish a prima facie case with respect to his claims alleging ineffective assistance of counsel.  (ECF No. 34-21.)

Petitioner filed a fourth habeas corpus petition in the Amador County Superior Court on December 16, 2021 alleging loss of personal property.  (ECF No. 34-22.)  The Amador County Superior Court denied this petition on March 17, 2022.  (ECF No. 34-23.)

Petitioner filed a habeas corpus petition in the California Court of Appeal on July 28, 2021 raising claims challenging the validity of his conviction.  (ECF No. 34-24.)  The California Court of Appeal denied this petition without comment or citation on November 29, 2021.  (ECF No. 34-25.)

Petitioner filed a second habeas corpus petition in the California Court of Appeal on May 6, 2022 alleging loss of personal property.  (ECF No. 34-26.)  The California Court of Appeal denied this petition on May 25, 2022.  (ECF No. 34-27.)

Petitioner filed a habeas corpus petition in the California Supreme Court on September 30, 2020 raising claims challenging the validity of his conviction.  (ECF No. 34-28.)  The California Supreme Court denied this petition on February 17, 2021, apparently without comment or citation.  (ECF No. 34-29.)

Petitioner filed a second habeas corpus petition in the California Supreme Court on January 3, 2022 raising claims challenging the validity of his conviction.  (ECF No. 34-30.)  The California Supreme Court denied this petition on June 1, 2022, apparently without comment or citation.  (ECF No. 34-31.)

Petitioner filed a third habeas corpus petition in the California Supreme Court on October 18, 2022 alleging loss of personal property.  (ECF No. 34-32.)  The California Supreme Court denied this petition on July 11, 2022, apparently without comment or citation.  (ECF No. 34-33.)

Petitioner filed his petition in the United States District Court for the Eastern District of California on November 2, 2021.  (ECF No. 9.)  This action was administratively stayed from October 21, 2022, through June 13, 2022 while petitioner exhausted state court remedies.  (ECF

4

No. 20.)  Respondent filed the answer to the petition on November 10, 2022.  (ECF No. 35.)

Petitioner filed a reply/traverse to the answer on January 18, 2023.  (ECF No. 38.)

## III.   FACTUAL BACKGROUND

After independently reviewing the record, this Court finds the state appellate court's

factual summary to be accurate and adopts it herein:

> **The Incidents**
>
> From February to March 2015, [footnote 2] 31-year-old defendant lived with his girlfriend K.R., her 13-year-old daughter T.L., and K.R.'s younger daughter. They resided in defendant's mobile home, with the two girls staying in rooms on either side of the bedroom defendant and K.R. shared. Defendant's friend Melanie Keathley lived with them from January to March 16.
>
>> [Footnote 2: All further statutory references are to the Penal Code.]
>
> The door to defendant's bedroom was noisy when opened unless the handle was pushed and lifted. The home's thin walls allowed noise to be heard in other rooms. T.L.'s bedroom had no door, with the entry covered by a blanket or sheet.
>
> On the evening of March 17, T.L. reported to Amador County Sheriff's Deputy Justin Coletti that defendant had sexually abused her. Between 1:00 a.m. to 2:00 a.m. on March 14, she awoke to a painful thrust in her vaginal area and discovered her shirt was pulled down, exposing her breasts. T.L. made eye contact with defendant, who removed one or more fingers from her vagina. After she woke up, defendant placed his mouth on her breasts. During this time, defendant left her immediate area, went to the doorway, and then returned to molest her two more times. Defendant put his hand down her pants and touched her crotch and grabbed her buttocks and vagina under her clothes before finally leaving. She then tried to text her boyfriend before going to the bathroom, where she discharged a little blood.
>
> T.L. testified [footnote 3] that she told K.R. about the incident days after. K.R. reacted in a shocked manner, as if she did not know how to deal with it. She was angry with defendant and seemed sad. Nonetheless, she left T.L. and her sister in defendant's care.
>
>> [Footnote 3:  When T.L. refused to testify after being offered use immunity, the trial court found her unavailable and the parties stipulated to the use of her preliminary hearing testimony, which was read to the jury.]
>
> T.L. told Deputy Coletti that on March 17, she and defendant were on the couch watching a movie when defendant started tickling her side just above the hip and below the rib cage. When T.L. tried to get up, defendant grabbed her arm, causing her to fall across his lap. She

5

felt what seemed like his forearm rubbing against her vaginal area; as the rubbing got more precise, she determined defendant was using his fingers. T.L. told defendant to stop, and he eventually did. After she went to the bathroom and locked herself inside, defendant asked her, "you are not going to tell anyone, are you."

K.R. testified that while she was at work, T.L. texted her that she was in the bathroom and scared. T.L. had told her the previous day that something had happened. An angry K.R. left work and raced home.

California Highway Patrol Officer Deborah Zaragoza pulled over K.R. for speeding as she was heading home. K.R. showed a text message to Officer Zaragoza and said she needed to get home because she got a text from her daughter that "my boyfriend touched her inappropriately." Officer Zaragoza did not read the text but requested for a sheriff's deputy to respond to the home and then followed K.R. home.

Officer Zaragoza knocked on the front door while K.R. went to the back of the home. Defendant answered the front door and the officer asked him to come out to the front with her. A quiet and subdued defendant complied. Officer Zaragoza went into the house after deputies arrived, finding a quiet, not hysterical T.L. talking to a deputy with her mother nearby. A frantic and angry K.R. told Officer Zaragoza she did not expect this to happen because she trusted defendant.

Deputy Coletti took T.L.'s statement at this time. She was visibly upset, appeared to have been crying, and whimpered as she reported the incidents to the deputy. That night, K.R. took T.L. to the hospital, where she was evaluated and told a nurse what happened.

K.R. and T.L. met Amador County Sheriff's Detective Ezra Peckinpaugh on March 18. K.R. told the detective about T.L.'s text. She was present when T.L. talked to the detective. Detective Peckinpaugh and K.R. described T.L.'s demeanor at this time as upset, uncomfortable and nervous, and very shut down and introverted.

T.L. told the detective that late at night on March 13, or early in the morning on March 14, she awoke to a sharp pain and crammed feeling in her vagina. Defendant was crouched next to her bed, and her shirt was pulled down, exposing her breasts. Defendant withdrew his fingers after she moved. Defendant walked to the doorway, but returned, pulling her shirt down, placing her right breast in his mouth, and grabbing her buttocks through her clothes. He stood up, grabbed her breasts with his hand, and left the room. Defendant soon reentered T.L.'s room, where he grabbed her buttocks through the bedsheet and her clothing as he breathed heavily.

K.R. testified that after she and T.L. got home from a trip to Stockton on March 15, T.L. asked her how she felt about cheating and how she felt about rape. This seemed odd to K.R. but T.L.'s demeanor seemed normal when she asked the questions. T.L.'s behavior did not change from that Saturday the 14th to Monday the 16th. While

6

K.R. likewise testified defendant's behavior was unchanged that weekend, she told Detective Peckinpaugh he acted weird and standoffish and was very inquisitive about whether T.L. had told her anything. She also told the detective defendant texted her on March 17 and asked if everything was all right, mentioned having a good conversation with T.L., and asked if she had talked to T.L.

Defendant came to K.R.'s work (a local restaurant) at 7:00 p.m. on March 13 and stayed until her shift ended at 1:30 a.m. She gave him a ride to his vehicle, and they drove their respective vehicles home, arriving at around 2:15 a.m. Her daughters and Keathley were home. K.R. and defendant went into their bedroom and closed the door. K.R. showered for about eight minutes; she did not hear their noisy bedroom door open while showering. Defendant was sitting on the bed when she showered and was in bed when she got out.

Sometime after 2:00 a.m., a neighbor knocked on the door and told Keathley that the lights inside defendant's truck were on. Keathley texted defendant about the neighbor's report. Defendant went outside to turn off the lights and returned to the bedroom after about five minutes, sleeping there with K.R.

A few days after the incidents, K.R. and her daughters moved in with Keathley, who had gotten her own place. They stayed with Keathley through June. Shortly after K.R. moved in, she told Keathley that defendant had molested T.L. K.R. maintained contact with defendant during this time, and texted him in March and April that she loved him. Defendant would also show up while K.R. and her children were staying with Keathley, which caused yelling and screaming arguments between K.R. and T.L. T.L. did not want defendant there and would stay in her room when he came over. Defendant took care of K.R. in Keathley's home in May after she returned home from the hospital following a car accident. K.R. and her daughters moved into defendant's mother's house in June, staying with defendant and his mother until November. K.R. was still in a relationship with defendant at the time of the trial; she loved defendant and did not want to see anything bad happen to him.

According to K.R. and T.L., shortly after March 17, a crying T.L. told K.R. that the incidents with defendant had not happened. K.R. came up with the idea of writing a retraction letter. Since T.L. was upset and crying, K.R. wrote the letter and T.L. signed it. T.L. was crying at the time because she was upset over what she said about defendant. T.L. and K.R. denied that K.R. pressured her into signing or writing the letter.

Keathley saw two letters addressed on the kitchen counter in March, sometime after K.R. and her daughters moved in, with one beginning, "[T]o whom it may concern." K.R. and T.L. argued about the letter, with T.L. screaming and crying. K.R. was set in stone regarding what she wanted the letter to say; what T.L. felt did not matter.

K.R. gave the retraction letter to Detective Peckinpaugh on March 19, explaining she wrote the letter and T.L. signed it. Detective

Peckinpaugh was concerned, so he arranged for T.L. to come in and speak with him, but K.R. never brought her in.

A child protective services social worker talked to T.L. about the letter. T.L. said that what she told the deputies was true. T.L. testified that she thought the social worker was talking about the retraction letter when she answered. On May 20, shortly after the social worker's visit, Detective Peckinpaugh went to T.L.'s school to talk to her about the letter, but she refused to talk with him other than to say the letter had been sent.

T.L. testified that what she told Deputy Coletti about the incidents did not actually happen. She was with defendant on March 17, because what she had claimed he did to her previously had never happened. She fabricated the claims about defendant because she did not want him to be with K.R. Crying, she testified that she felt really bad about this.

Keathley had four prior convictions and was in jail for the most recent conviction on December 1. She saw defendant at jail at this time. He asked her a couple of times if she had talked to anyone and also told her not to talk to anyone.

**Prior Uncharged Misconduct**

When R.B. was 14 in 2003, defendant was her counselor at a teen center that provided counseling and support for crime victims. Defendant, who was 19, asked her to perform oral sex on him after meeting her at school and driving off with her in his car. She agreed and did so. They next went to his apartment where she consented to intercourse. Defendant later phoned a district attorney's investigator and admitted to having oral sex and consensual intercourse with R.B.

In 2003, defendant was also a counselor to 16-year-old A.T. at the same teen center. One day at the teen center, defendant kissed her and put his hands on her breast and vaginal area, under her clothes. A.T. told an investigator defendant kissed and grabbed her breast when they were playing a card game at the teen center. A.T. accompanied defendant downstairs, where he kissed her, pulled down her top, and sucked on her breast. Defendant put her hand on his erect, exposed penis. He then pulled down her pants and underwear and put his fingers in her vagina. A.T. told defendant she could not go through with this before he put his fingers in her. Defendant initially denied the incident to the investigator, but later said A.T. told him she could not go through with it after he put his fingers in her vagina.

K.G. knew defendant in high school when she was a freshman and he was a year or two ahead of her. K.G.'s sister was five or six years older than her and dating defendant's brother. In 2000, 14-year-old K.G. and her sister went with defendant and his brother first to a mall then to a residence late at night. They laid out blankets on the floor; K.G.'s sister suggested she could sleep on the floor next to defendant but K.G. said she did not want to. K.G.'s sister went into a bedroom with defendant's brother. K.G. went to sleep and awoke to defendant

8

on top of her, having intercourse with her. Even though K.G. told defendant to stop multiple times, the sexual assault lasted for a couple of minutes. K.G., who never had sexual intercourse before, went to the bathroom and cried. She had really bad vaginal bleeding after the assault. Forty-five minutes after the assault, she came out of the bathroom and curled up onto a recliner. She did not tell anyone that night, but in 2002 or 2003 she told her mother, who reported the matter.

**CSAAS Testimony**

Dr. Anthony Urquiza, a psychologist, testified as an expert on CSAAS. CSAAS was first formulated in an article written by Dr. Roland Summit in 1983. It is an educational tool for therapists treating sexually abused children to better understand what happens to the child and the myths and misperceptions related to child sexual abuse. It is not a predictive tool, as it is used only on children who have been abused.

Dr. Urquiza's testimony was intended to explain CSAAS in order to dispel common misperceptions about how sexually abused children react. He had not spoken to the victim and knew nothing about the case. CSAAS could not be used to determine whether a person was guilty or whether a particular child was molested, and he did not intend to do so.

Dr. Urquiza described the five parts of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and recantation or retraction of the abuse allegation. With respect to secrecy, Dr. Urquiza explained some of the reasons why children often keep sexual abuse a secret. He said most children are sexually abused by someone they know who is bigger, stronger, more knowledgeable and may be in a position of authority over the child. Abusers may also use strategies such as threats, intimidation, special attention, gifts, or favors to keep their victim quiet.

The helplessness component addresses the misperception that children will be able to do something to keep themselves safe. Because of their inherent helplessness, most abused children submit and accept the fact there is nothing they can do to stop the abuse.

Entrapment explains that a child who cannot tell anyone or stop the abuse from continuing is trapped. With respect to accommodation, children may accommodate the abuse by disconnecting from the experience and suppressing feelings in order to cope with it. A child may thus discuss the abuse unemotionally due to disassociation and suppression of feelings. Just because a child does not break down and cry does not mean the child was not abused.

Delayed and unconvincing disclosure is tied to the secrecy component, because it is common for a child to delay reporting the abuse to maintain secrecy for awhile. Most children do not tell right away. There may be inconsistencies or vague descriptions in a child's first report, but more supportive responses may lead to a more

9

detailed version as the child becomes more comfortable about reporting. Inconsistencies may increase with the incidents of abuse, as more incidents can make it more difficult for the child to be specific about a particular occasion.

Dr. Urquiza testified that 20 to 25 percent of children who have been abused disclose and then retract the allegation, usually because of pressure from the child's family.

Dr. Urquiza opined that hypothetical situations posed by the prosecutor were consistent with an unconvincing disclosure and a mother not giving support in regard to retraction. A hypothetical victim awakened while being sexually assaulted and then remaining silent was consistent with the helplessness component of CSAAS. A hypothetical victim's vague description of abuse was consistent with unconvincing disclosure. A child locking oneself in a bathroom after being abused multiple times could be an example of a victim's futile efforts to keep safe.

People v. Aroz, 2020 WL 4915573, at *1-*5 (Cal. App. 2020).

## IV.     STANDARDS FOR A WRIT OF HABEAS CORPUS UNDER ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT ("AEDPA")

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of holdings of the Supreme Court at the time of the last reasoned state court decision.  Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, there is no "clearly established federal law" governing that issue.  See Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413; see also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro v. Landrigan,

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Id. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.  Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

1  merits.  Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98).  If a

2  state court fails to adjudicate a component of the petitioner's federal claim, the component is

3  reviewed de novo in federal court.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

4         Where the state court reaches a decision on the merits but provides no reasoning to

5  support its conclusion, a federal habeas court independently reviews the record to determine

6  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

7  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

8  review of the constitutional issue, but rather, the only method by which we can determine whether

9  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

10 reasoned decision is available, the habeas petitioner has the burden of "showing there was no

11 reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

12        A summary denial is presumed to be a denial on the merits of the petitioner's claims.

13 Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

14 just what the state court did when it issued a summary denial, the federal court reviews the state

15 court record to "determine what arguments or theories . . . could have supported the state court's

16 decision; and then it must ask whether it is possible fairminded jurists could disagree that those

17 arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

18 Court."  Richter, 562 U.S. at 101.  It remains the petitioner's burden to demonstrate that 'there

19 was no reasonable basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939

20 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

21        When it is clear, however, that a state court has not reached the merits of a petitioner's

22 claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

23 habeas court must review the claim de novo.  Stanley, 633 F.3d at 860 (citing Reynoso v.

24 Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006)).

25 **V.    DISCUSSION**

26        **A.    Claim 1: Alleged Denial of Right to Counsel of Choice**

27        Petitioner argues that the trial court violated his right to counsel of choice when it failed to

28 appoint his retained counsel when petitioner was no longer able to afford retained counsel.  (ECF

13

1    No. 9 at 10-11.)  The California Court of Appeal issued the last reasoned state court decision

2    addressing this claim.  The California Court of Appeal denied this claim for the following

3    reasons:

4               <u>Choice of Counsel</u>

5               A. Facts

6               Defendant was represented by a retained attorney, Matthew Ninke,
through the preliminary hearing and a continuance for arraignment.
7               Ninke then informed the trial court he had been contracted only
through the arraignment. Ninke told the court defendant was
8               indigent, that some other counsel had conflicts, another attorney may
not have a conflict, and he would be willing to accept appointment if
9               the court went "off the wheel." The trial court checked with two
attorneys, both of whom had conflicts.
10

11               When the trial court asked whether attorney James Clark had a
conflict, Clark replied that he did not know anything about the case
12               and did not think so. Defendant replied that he would like to keep
Ninke as his counsel, stating, "[I]f I give up Mr. Ninke as my
13               attorney, I'm going to have to waive time. I'm not wanting to waive
time. I want to get this done and over with a speedy trial." He added
14               that there were too many details for a new attorney to pick up and
reiterated that he did not want to waive time.
15

16               The court then held a discussion in chambers with the prosecutor,
Ninke, and Clark, during which the court stated that it would appoint
17               an attorney in accordance with its policy and procedures, and also
discussed any potential conflicts of interest with Clark.  [Footnote 4.]
18               Clark had no conflict of interest in this case and the court appointed
him as defendant's counsel.
19

20                       [Footnote 4:  Defendant claims on appeal that the trial court
                      refused to appoint Ninke because he was not on the conflict
21                       "wheel." Defendant's appellate counsel sent a proposed
                      settled statement that the trial court rejected, as there was no
22                       discussion of the conflict wheel in chambers, and the
                      discussion in chambers was only to ascertain whether Clark
23                       had any potential conflicts. We reject defendant's factual
                      assertions to the extent they conflict with the settled
24                       statement.]

25               B. The Claim

26               Defendant contends the trial court's appointment of Clark was an
abuse of discretion as there was no valid reason for it to deny
              defendant his choice of counsel. He claims the decision violated his
rights to due process, counsel of choice, and a fair trial.
27

28               A criminal defendant has a right to counsel in a criminal proceeding,
either by a qualified attorney who is willing to represent the
              defendant for whatever the defendant is willing to pay, or through

appointed counsel if the defendant cannot retain representation. (People v. Noriega (2010) 48 Cal.4th 517, 522.) The right to appointed counsel, however, does not contain a right to counsel of one's choice. (Ibid.; see United States v. Gonzalez-Lopez (2006) 548 U.S. 140, 151.)

Section 987 establishes the appointment of counsel for indigent defendants. (People v. Chavez (1980) 26 Cal.3d 334, 344.) A court may appoint private counsel to represent a defendant if the county has no public defender or if the public defender is properly refused for good reason. (§ 987.2, subd. (a).)

Section 987.2 sets forth the following procedure for counties that use an assigned private counsel system:

"In counties that utilize an assigned private counsel system as either the primary method of public defense or as the method of appointing counsel in cases where the public defender is unavailable, the county, the courts, or the local county bar association working with the courts are encouraged to do all of the following:

"(1) Establish panels that shall be open to members of the State Bar of California.

"(2) Categorize attorneys for panel placement on the basis of experience.

"(3) Refer cases to panel members on a rotational basis within the level of experience of each panel, except that a judge may exclude an individual attorney from appointment to an individual case for good cause.

"(4) Seek to educate those panel members through an approved training program.

"(5) Establish a cost-efficient plan to ensure maximum recovery of costs pursuant to Section 987.8." (§ 987.2, subd. (c).)

"The appointment of counsel for indigent defendants under section 987.2 rests within the sound discretion of the trial court. [Citation.] The court's discretion in the appointment of counsel may not be restricted by any fixed policy (e.g., a superior court policy to appoint its 'own' counsel in every case [citation] ). An abuse of discretion is not demonstrated, however, simply by the failure of a trial court to appoint a particular counsel whom the defendant has requested and who is willing to undertake the appointment. [Citation.]" (People v. Horton (1995) 11 Cal.4th 1068, 1098; id. at pp. 1099-1100 [no abuse of discretion despite bond of trust where record did not show counsel of choice was competent to handle case after preliminary examination stage].)

It appears the trial court followed its standard procedure under section 987.2, subdivision (c) in appointing Clark to represent defendant. After determining defendant could no longer afford retained counsel, the court inquired whether other attorneys

1

2       apparently available for appointment had a conflict, and appointed
        the first attorney who had no conflict and was available. Ninke
        evidently was not considered because he was not on the panel
        mandated by section 987.2, subdivision (c).

3

4       While defendant wanted his previously retained counsel in order to
        obtain a speedier resolution of his case, there is no evidence he was
        prejudiced by the appointment. Defendant claims the trial court

5       should have been informed by subdivision (d) of section 987.2,
        which allows a trial court in a county of the first, second, or third

6       class to, in the interest of justice, "depart from that portion of the
        procedure requiring appointment of the second public defender or a

7       county-contracted attorney after making a finding of good cause and
        stating the reasons therefor on the record." Defendant's reliance on

8       this provision is unavailing because Amador County is not a county
        of the first, second, or third class. (§ 987.2, subd. (j); Gov. Code, §§

9       28020, 28022, 28023, 28024.)

10      We are likewise unconvinced by defendant's citation to the statement
        in Alexander v. Superior Court (1994) 22 Cal.App.4th 901 that the

11      better practice is to continue the appointment of the attorney.
        Defendant quotes selectively from Alexander, which states in

12      pertinent part, "ordinarily it is the better practice to continue in
        superior court the appointment of the attorney assigned to an indigent

13      defendant in municipal court." (Id. at p. 914, italics added.)
        Defendant omits the italicized portions of the quote, which, read in

14      the proper context, does not support his position. Alexander
        addressed the appointment of counsel where the defendant had

15      already been appointed counsel in municipal court (id. at p. 904),
        unlike the case here, where defendant could no longer have retained

16      counsel and now needed someone appointed for him. It does not
        support requiring a court to disregard its procedure to appoint a

17      previously retained counsel.

18      Since defendant does not show the trial court failed to follow proper
        procedures for appointment of counsel, the court's decision to

19      appoint a counsel that was available from the appointment panel
        rather than the previously retained attorney who was not, was within

20      the trial court's sound discretion.

21   People v. Aroz, 2020 WL 4915573, at *5-*7.

22        The Sixth Amendment right to counsel contains two distinct elements: "a right to adequate

23   representation and a right to choose one's own counsel."  United States v. Rivera-Corona, 618

24   F.3d 976, 979 (9th Cir. 2010) (internal citations omitted).  The adequate-representation aspect of

25   the right to counsel applies to all defendants and "focuses on the adversarial process, not on the

26   accused's relationship with his lawyer as such."  United States v. Cronic, 466 U.S. 648, 657 n.21

27   (1984).

28        By contrast, the right to select one's counsel does not apply to a defendant who has an

16

attorney appointed by the court at the public's expense.  <u>Rivera-Corona</u>, 618 F.3d at 978.  As the

Supreme Court has explained, "those who do not have the means to hire their own lawyers have

no cognizable complaint so long as they are adequately represented by attorneys appointed by the

courts."  <u>Caplin & Drysdale v. United States</u>, 491 U.S. 617, 624 (1989).

At the time the trial court appointed attorney Clark to represent petitioner, as opposed to

previously retained attorney Ninke, petitioner did not have a right to counsel of choice because

petitioner was indigent.  As discussed by the California Court of Appeal, attorney Clark was

appointed at the public's expense.  For these reasons, petitioner's claim alleging that the trial

court violated his right to counsel of choice by failing to appoint previously retained attorney

Ninke after petitioner became indigent is without merit.

The denial of this claim by the California Court of Appeal was not contrary to or an

unreasonable application of clearly established Supreme Court authority.  Accordingly, claim one

should be denied.[3]

**B.      Claim 2: Alleged Improper Admission of Prior Uncharged Sexual Misconduct**
**Evidence**

Petitioner argues that the trial court abused its discretion in allowing evidence of prior

uncharged sexual misconduct.  (ECF No. 9 at 12-13.)  The California Court of Appeal issued the

last reasoned state court decision addressing this claim.  The California Court of Appeal denied

this claim for the following reasons:

**Uncharged Sexual Misconduct**

Defendant contends it was an unconstitutional abuse of discretion to admit the uncharged sexual misconduct evidence over his objection. We disagree.

"By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its

_____

[3]   In his state appeal and in the instant petition, petitioner argued that the appointment of attorney Clark forced him to waive time.  Petitioner's claim that he was forced to waive time may suggest a speedy trial claim.  Because petitioner does not clearly raise a speedy trial claim, and because a speedy trial claim appears unexhausted, this court will not address this matter further.

nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (People v. Falsetta (1999) 21 Cal.4th 903, 916-917.)

We review a trial court's ruling under Evidence Code section 1108 for abuse of discretion. (People v. Loy (2011) 52 Cal.4th 46, 61.)

The incident involving R.B. was remote, taking place in 2003, 12 years before the charged offenses. Like the present charged crimes, this uncharged offense involved a victim, the 14-year-old R.B., of a similar age to the 13-year-old T.L. Although R.B. assented to the sex acts, the incident was nonetheless admissible to show the sexual interest defendant has to girls of a similar age to T.L. It also showed defendant's willingness to exploit a position of trust or power, the boyfriend of T.L.'s mother or R.B.'s counselor, to satisfy his sexual desires.

The incident involving A.T. was remote like the incident with R.B. It involved a 16-year-old victim, and defendant put his fingers in her vagina after she told him not to. This uncharged offense is relevant by showing defendant's willingness to exploit a position of trust and power to satisfy his sexual attraction to underage girls, even when the girl does not consent.

While defendant was apparently underage when he committed the incident against 14-year-old K.G., this incident shows defendant's willingness to commit a sexual assault against his younger victim. The assault against K.G. was also initiated when K.G. was sleeping, like the March 14 incident against T.L. Like the March 14 assault on T.L., defendant penetrated K.G.'s vagina in this sexual assault, albeit with his penis rather than the digital penetration he committed against T.L.

The uncharged incidents were not more egregious than the charged offenses, which involved a sexual assault and digital penetration by defendant against the 13-year-old daughter of his girlfriend. While each uncharged incident had some dissimilarities with the charged offenses, an exact match is not necessary to render uncharged sexual misconduct admissible. (See People v. Soto (1998) 64 Cal.App.4th 966, 984 [Evid. Code, § 1108 does not require exacting similarity between charged and uncharged offenses].) The uncharged offenses are sufficiently similar to the charged crimes to render them relevant. The 12 to 15 years between the charged and uncharged offenses likewise does not defeat their admissibility in light of their similarity to the charged crimes. (See, e.g., People v. McCurdy (2014) 59 Cal.4th 1063, 1099 [approximately 30 years not too remote]; People v. Robertson (2012) 208 Cal.App.4th 965, 992-994 [thirty years before the charged crime not too remote]; People v. Branch (2001)

1

2

3

4

5

6

7

8

> 91 Cal.App.4th 274, 284-285 [same]; Soto, at pp. 969-970, 977-978, 991 [uncharged acts 30 and 22 years earlier not too remote].) The uncharged acts did not involve excessive time to admit, taking the brief testimony of four witnesses. They also would not confuse or distract the jurors, as the facts of the uncharged misconduct did not involve disputed facts. Given their relevance and lack of prejudice in relation to the charged crimes, their admission was not an abuse of discretion.
>
> Since the evidence was properly admitted under Evidence Code sections 1108 and 352, defendant's constitutional claim fails as well. (People v. Harris (2005) 37 Cal.4th 310, 336 ["the application of ordinary rules of evidence does not implicate the federal Constitution"].)

9 People v. Aroz, 2020 WL 4915573, at *10-12.

10          The admission of evidence does not provide a basis for habeas relief unless it rendered the

11 trial fundamentally unfair in violation of due process.  Estelle, 502 U.S. at 72.  "Under AEDPA,

12 even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not

13 permit the grant of federal habeas corpus relief if not forbidden 'by clearly established Federal

14 law,' as laid out by the Supreme Court."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.

15 2009).

16          The United States Supreme Court has never held that the use of propensity evidence

17 violates due process or any other constitutional right of criminal defendants.  Mejia v. Garcia, 534

18 F.3d 1036, 1046 (9th Cir. 2008) (citing Alberni v. McDaniel, 458 F.3d 860, 863-67 (9th Cir.

19 2006)).  Where there is no Supreme Court precedent that controls a legal issue raised by a habeas

20 petitioner, the state court's decision cannot be contrary to, or an unreasonable application of,

21 clearly established federal law.  Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam).

22          Because the United States Supreme Court has not held that the use of propensity evidence

23 violates due process or any other constitutional right of criminal defendants, this court finds that

24 the denial of this claim by the California Court of Appeal was not contrary to or an unreasonable

25 application of clearly established Supreme Court authority.  Accordingly, petitioner's claim

26 challenging admission of the prior uncharged sexual misconduct evidence as unconstitutional

27 should be denied.

28          In his discussion of claim 2 in the traverse, petitioner argues that trial counsel was

ineffective for failing to request K.G.'s prior testimony transcripts. (ECF No. 38 at 9.) Petitioner raises this claim in claim 18. Accordingly, this Court addresses the claim regarding trial counsel's alleged failure to request K.G.'s prior testimony transcripts in the discussion of claim 18.

In his discussion of claim 2 in the traverse, petitioner also argues that trial counsel was ineffective for failing to file a bifurcation motion regarding the prior bad acts evidence. (Id. at 9.) In the instant petition, petitioner did not a raise a claim alleging that trial counsel was ineffective for failing to file a bifurcation motion regarding the prior bad acts evidence. This Court recommends that the court decline to consider this claim raised for the first time in the traverse. Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) ("A traverse is not the proper pleading to raise additional grounds for relief.").

C.      **Claim 3: Trial Court's Alleged Error in Allowing Prosecutor to Ask Expert Witness Hypothetical Questions Based on CSAAS**

Petitioner argues that the trial court erred in overruling trial counsel's objections to the prosecutor's hypothetical questions to the expert based on CSAAS. (ECF No. 9 at 14-15.) The California Court of Appeal issued the last reasoned state court decision addressing this claim. The California Court of Appeal denied this claim for the following reasons:

> **Improper CSAAS Hypotheticals**
>
> Defendant contends the trial court erred in overruling his objections to hypothetical questions the prosecutor asked of Dr. Urquiza. While we agree the trial court erred regarding two of the hypotheticals, we find the error harmless in light of Dr. Urquiza's answers, the court's instructions, and the prosecution's use of the improper hypotheticals.
>
> A. Facts
>
> On direct examination, the prosecutor gave the following hypothetical question to Dr. Urquiza: "Would you in your training and experience and research find that if a child reported sexual abuse to her mother, and not too specific terms at first, and then that mother didn't act and the abuse continued. And in this hypothetical, if the abuse happened again, and she told mom again and it was finally reported to law enforcement. And in this hypothetical, the mother was the only one with access to the child. Admitted that she still loved the defendant, was in contact with him, or the suspect or perpetrator I should say. And then soon after, the mother writes a letter of recantation, and it appears as though the child has signed it,

would these facts be consistent with a child who has the effects of the child sexual abuse accommodation syndrome?"

The defense objected, asserting this was an improper hypothetical. The trial court overruled the objection.

Dr. Urquiza answered:

"Well I don't know if this is in relation to the objection, but I want to clarify, it is not my place to make any determination as to whether any particular person is guilty of a crime or not or whether any particular child has been abused or not. That is just not my role.

"But clearly the scenario that you just provided is consistent with this notion of an unconvincing disclosure and this idea of retraction at least as it may be related to the presence of maternal support or ability to support a victim in their making and sustaining a disclosure."

The prosecutor then asked a hypothetical about whether a child's failure to yell out or scream during a sexual assault would be consistent with the helplessness component of CSAAS. The defense objected, and the trial court ordered the prosecutor to rephrase the question.

The prosecutor rephrased the hypothetical thusly: "I would like you to assume that there is a child who is awoken to being sexually assaulted or molested by a person who is bigger, stronger, and has more authority over that person.

"I would like you to also assume that when she awoke to that molestation, that she didn't scream out or call from help from her mother. Is that consistent with that helpless component that you described for the jury earlier?"

Dr. Urquiza answered:

"That pattern of events, the failure to cry out, the failure to protect themselves, the failure to do something that would be instrumental to keeping themselves sexually safe, is the reason why Dr. Summit specifically has that section on helplessness. Because he is trying to explain common characteristics of victims. And the fact that victims usually don't cry out. They don't usually do anything.

"Because in that situation, there is really nothing that they have available to them to be able to keep themselves safe. So that would, in that context, be a good system."

The prosecutor next asked: "I would like you to also assume some facts when it comes to a child who after being molested by that bigger, stronger person in authority, does disclose to a maternal support person. And I would also like you to assume that that person, mom—I am sorry—that that child vaguely describes inappropriate touching at first. Touching of the crotch and no further detail, is that consistent with that component that you described for the jury as the unconvincing aspect?"

21

Dr. Urquiza replied:

"Yes. What Dr. Summit—the simple answer is yes. But what Dr. Summit was trying to explain is just this notion that this disclosure, especially the initial disclosure, is just a difficult thing to do. And that is why it is better perceived not as an act, but as a process. And in the process, the statement is made by the victim. And then an assessment is made based upon the response of who they disclosed to.

"As I said earlier, if it is supportive, they can tell more. If it is not supportive, then it impairs the ability to talk more or inhibits their ability to talk more about what happened."

The prosecutor then asked: "I would also like you to assume some facts that this same child tells the parent, the mom, nothing happens. And that she is then in this hypothetical left alone with that suspect or perpetrator again. Is it consistent with the entrapment or accommodation component that the child, let's say, locks themselves in the bathroom?"

Defense counsel asked for and received a continuing objection to the hypotheticals.

Dr. Urquiza asked for the question again. The prosecutor replied by asking Dr. Urquiza if he had testified regarding entrapment and accommodation that there is a feeling the child cannot stop the abuse from happening again. After Dr. Urquiza agreed, the prosecutor asked if they have to learn to deal with it. Dr. Urquiza replied, "To deal with the feelings that they have about their experience of abuse, correct."

The prosecutor then posed the following hypothetical: "Now would it be—I would like you to assume some facts. Would it be consistent with a child who after being sexually abused again or multiple times, that they try to do something to protect themselves like lock themselves in the bathroom?"

Dr. Urquiza answered:

"One of the things that Dr. Summit talks about is that there are futile efforts that victims may attempt to engage to keep themselves safe. And the key word here is futile.

"For example, I have kids who would put on two or three pairs of pajamas at nighttime because in their mind, putting on more pajamas makes it more difficult for them. But, of course, there is no control there and so they get abused. I have had kids who pretend to be asleep. That seems kind of weird, if somebody is vaginally penetrating or something like that, molesting you, that you would be asleep.

"I don't think they are asleep. I think in a situation where there is nothing you can do about being revictimized, if you close your eyes, turn your head and be really still, that is your best way to cope with

22

that situation.

"So if you're asking me if locking yourself in the bathroom could be an example of that, certainly. It is not going to keep them from being abused.

"At some point, you have to come out of the bathroom. You can't live the rest of your life in the bathroom. So you have to come out. And the same thing with running away. At some point, you end up going home. And that is where you might get abused if you're running away.

"It is a futile effort to try to deal with the situation when nothing is going to work."

On cross-examination, defense counsel elicited the following statement about recantation from Dr. Urquiza: "I think just the statement of a child recanting is different than making a determination as to whether somebody was abused or not." Asked if recantation is not determinative, Dr. Urquiza answered: "I think the best method that we have for making that determination as to whether somebody has been abused or not or whether somebody is guilty or innocent of a crime is the jury hearing the evidence." Dr. Urquiza also reiterated on cross-examination that CSAAS is not used "to make a determination whether a particular person was guilty or innocent of a crime" or "whether a particular child was abused or not."

Following cross-examination, defense counsel clarified that his objections to the hypotheticals were that the prosecutor was trying to use them to show defendant's guilt through CSAAS rather than properly using CSAAS to dispel about child abuse. Defense counsel told the court he believed his cross-examination took care of the problem, but he was required to make the objection in order to render effective assistance of counsel.

B. Analysis

The applicable law regarding CSAAS testimony was summarized in People v. Sandoval (2008) 164 Cal.App.4th 994: "CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony 'is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]' [Citation.] '"Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior...." [Citation.]' [Citation.] 'For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often

23

created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings.... [Citation.]' [Citation.]" (Id. at pp. 1001-1002, fn. omitted.)

It is improper for an expert to apply CSAAS to the facts of the case and conclude a particular child was molested. (People v. Bowker (1988) 203 Cal.App.3d 385, 393.) It is also improper for an expert to testify about CSAAS in a manner that directly coincides with the facts of the case. (Id. at p. 394; People v. Gray (1986) 187 Cal.App.3d 213, 218; People v. Roscoe (1985) 168 Cal.App.3d 1093, 1100 [expert testimony must be limited to a discussion of victims as a class; the expert must not discuss the witness in the case].) It is error to admit a CSAAS expert's response to hypothetical questions that closely track the facts of the case. (People v. Jeff (1988) 204 Cal.App.3d 309, 337-339.)

The first hypothetical asked of Dr. Urquiza was clearly improper. It closely tracked many of the specific facts of the case. Furthermore, by failing to tie the hypothetical to one of the five parts of CSAAS or some other aspect of CSAAS as described by Dr. Urquiza, the hypothetical risked the jury improperly using the answer as evidence of guilt. Dr. Urquiza's answer essentially neutralized this problem by asserting it was not his place to opine on guilt and then tied the facts of the hypothetical to the CSAAS notions of unconvincing disclosure and retraction.

The second question, while it contained some facts of the case, relied on less specific facts than the first, and, more importantly, tied the question directly to one aspect of CSAAS, namely how a child's failure to cry out after being awakened by a sexual assault is consistent with the helplessness component of CSAAS. Dr. Urquiza's answer again steered the discourse away from improperly using CSAAS as a predictive tool.

The third question, where the prosecutor asks if a child assaulted by a bigger stronger person in authority and then gives a vague description of the assault is acting consistently with the unconvincing aspect of CSAAS, is likewise proper. While the facts somewhat trace some of the facts of the case, they are still general, and the question is directly tied to an aspect of CSAAS and is used to explain a potentially unconvincing part of T.L.'s testimony. This is a proper use of CSAAS.

The fourth question is more like the first, as takes particular facts from the case, the victim locking herself in the bathroom after being sexually abused multiple times, and weakly tries to tie that to CSAAS of the helplessness component of CSAAS. Dr. Urquiza responds by talking more generally about the helplessness component of CSAAS and then gives examples involving facts different from those in defendant's case.

1
2
3
4
5
6
7
8

> Improper use of CSAAS testimony as evidence of guilt is subject to the <u>People v. Watson</u> (1956) 46 Cal.2d 818 standard of harmless error. (<u>People v. Bowker</u>, <u>supra</u>, 203 Cal.App.3d at p. 395.) While the first and fourth hypotheticals were improper, the combination of Dr. Urquiza's answers to them and his subsequent responses to the defense's questions on cross-examination render the error harmless. Dr. Urquiza made it clear on direct and cross-examination that his testimony could not be used as evidence that defendant committed the charged offenses or T.L. was in fact molested, and that the best determinant of guilt was the jury hearing the evidence. His answers to the improper questions also diverged from the specific facts of the case to more general issues related to CSAAS. Concluding it is not reasonably probable that a different result would ensue if the objections to the improper questions had been sustained, we find the error here harmless.

9      <u>People v. Aroz</u>, 2020 WL 4915573, at *7-10.

10          There is no clear Supreme Court authority holding that admission of expert testimony

11  concerning an ultimate issue to be decided by the jury violates the Constitution.  <u>Moses v. Payne</u>,

12  555 F.3d 742, 761 (9th Cir. 2009).  "[I]t is 'well-established ... that expert testimony concerning

13  an ultimate issue is not per se improper.'"  <u>Id.</u> (quoting <u>Hangarter v. Provident Life & Accident</u>

14  <u>Ins. Co.</u>, 373 F.3d 998, 1016 (9th Cir. 2004) (internal quotation marks omitted) (alterations in

15  original)).  "Although '[a] witness is not permitted to give a direct opinion about the defendant's

16  guilt or innocence .... an expert may otherwise testify regarding even an ultimate issue to be

17  resolved by the trier of fact.'"  <u>Id.</u> (quoting <u>United States v. Lockett</u>, 919 F.2d 585, 590 (9th Cir.

18  1990)).

19          This Court finds that the at-issue hypothetical questions did not result in a violation of

20  clearly established Supreme Court authority because, in response to these questions, Dr. Urquiza

21  did not give a direct opinion regarding petitioner's guilt or innocence.  To the extent the first and

22  fourth hypothetical questions improperly sought to solicit Dr. Urquiza's opinion on petitioner's

23  guilt or innocence by taking particular facts from the case, Dr. Urquiza's responses neutralized

24  the error by tying the facts of the hypotheticals to components of CSAAS.  Dr. Urquiza also

25  testified that he was not testifying as to petitioner's guilt or innocence.  The jury was also

26  instructed that Dr. Urquiza's testimony was not evidence that petitioner committed any of the

27  charged crimes.  (ECF No. 34-6 at 159 (CALCRIM No. 1193).)

28          For the reasons discussed above, this Court finds that the denial of this claim by the

1   California Court of Appeal was not contrary to or an unreasonable application of clearly

2   established Supreme Court authority.  Accordingly, petitioner's claim challenging admission of

3   the hypothetical questions to CSAAS expert Dr. Urquiza should be denied.

4        **D.**     **Claim 4: Alleged Violation of Confrontation Clause and Ineffective Assistance**

5              **of Counsel**

6        Claim four appears to raise three claims.  First, petitioner argues that the trial court

7   violated his right to confrontation when it wrongly found that T.L.'s preliminary hearing

8   testimony was admissible because she was unavailable.  (ECF No. 9 at 16.)  Second, petitioner

9   argues that his right to confrontation was violated when petitioner's "innocent tickling" statement

10  to law enforcement was admitted through T.L.'s preliminary hearing testimony.  (Id.)  Third,

11  petitioner argues that trial counsel was ineffective for failing to prepare and investigate the

12  preliminary hearing transcripts.  (Id.)

13       Petitioner raised the claims raised in claim 4 in his second habeas corpus petition filed in

14  the California Supreme Court.  (ECF No. 34-30 at 9.)  Because no state court issued a reasoned

15  decision addressing these claims, this Court independently reviews the record to determine

16  whether habeas corpus relief is available under 28 U.S.C. § 2254(d).  Stanley, 633 F.3d at 860.[4]

17         1.  Background

18       After the sexual assaults, T.L. told her mother, and then law enforcement, about

19  petitioner's molesting acts.  The second assault began with petitioner tickling T.L. on March 17,

20  2015.  (ECF No. 34-2 at 162-63.)  Deputy Coletti contacted petitioner on March 17, 2015.

21  Deputy Coletti's report from that contact states that petitioner denied sexually assaulting T.L. but

22  admitted tickling her.  (ECF No. 34-6 at 15.)

23       Later, T.L. testified at the preliminary hearing.  By that time, she had recanted her previous

24

25  [4] The Amador County Superior Court's decision finding that petitioner failed to establish a prima facie case as to the ineffective assistance of counsel claims raised in his third habeas petition filed

26  in the Amador County Superior Court was not a reasoned decision.  See Khatkarh v. Becerra, 442 F. Supp. 3d 1277, 1292 (E.D. Cal. March 5, 2022) (Superior Court decision denying claim for

27  failing to establish prima facie case for relief is decision on merits but with no developed reasoning to support conclusion; accordingly, court independently reviews record to determine

28  whether relief is available).

statements to law enforcement that petitioner sexually assaulted her.  (ECF No. 34-1 at 32.)
Although she recanted her previous statements to law enforcement, at the preliminary hearing
T.L. described her previous reports of assaults by petitioner.  T.L. described her previous report
of the March 17, 2015 assault that began with petitioner tickling her.  (Id. at 43-46, 48-49.)  T.L.
then testified that "nothing happened" between her and petitioner and that she told her mom that
she made the story up.  (Id. at 52, 65-66, 68-69.)

Later in the preliminary hearing, T.L. specifically recanted her previous statements to law
enforcement that petitioner tickled her on March 17, 2015.  (Id. at 72-73.)

> Q: And was Alex tickling you on Saint Patrick's Day?
>
> A: No.
>
> Q: So that never happened?
>
> A: No.
>
> Q: He never tickled you?
>
> A: No.
>
> Q: You guys were never goofing off the couch?
>
> A: No.
>
> Q: Do you know that Alex told Deputy Coletti that he was tickling you on that day?
>
> A: No.
>
> Q: So you say it didn't happen, but he says it happened?
>
> A: Okay, wait.  So there wasn't like sexual tickling.  It was like right here (indicating) because I—
>
> Q: He tickled you?  He tickled you, right?
>
> A: I thought you were asking about like the sexual nature of it.  That is what I thought.  I am sorry.
>
> Q: So he did tickle you?
>
> A: Yes.
>
> Q: You guys were playing around on the couch?
>
> A: With the tickling yes.  But there wasn't anything besides that.

27

1    Q: He never pulled you onto his lap?

2    A: No.

3    Q: He was just tickling on the couch?

4    A: Yes.

5    Q: Where was he tickling you on your body?

6    A: Like right here (indicating).

7    Q: So you are pointing to like your rib cage below your breast?

8    A: Yes.

9    Court: The record will reflect the witness on both sides on her right
     and left side about halfway up from her waist to her armpit.

10

11   (Id. at 72-74.)

12   At trial, T.L.'s preliminary hearing testimony was read to the jury after she exercised her

13   Fifth Amendment right not to incriminate herself and refused to testify.  (Id. at 268-71; ECF No.

14   34-2 at 1-64.)  Through the reading of T.L.'s preliminary hearing testimony, the jury heard the

15   prosecutor's question to T.L., "Do you know that Alex told Deputy Coletti that he was tickling

16   you on that day?"  (ECF No. 34-2 at 59.)

17   At trial, Deputy Coletti testified regarding T.L.'s pre-recantation statement that petitioner's

18   second sexual assault began with tickling.  (Id. at 162-63.)  Detective Peckinpaugh also testified

19   that T.L. told him that on March 17, 2015, petitioner grabbed her while they were sitting on the

20   couch and began tickling her.  (Id. at 186.)  T.L. told Detective Peckinpaugh that petitioner then

21   sexually assaulted her.  (Id.)

22   No law enforcement personnel testified at trial regarding petitioner's innocent-tickling

23   admission.

24   2.   Confrontation Clause Claims

25   Under the Sixth Amendment's Confrontation Clause, "[i]n all criminal prosecutions, the

26   accused shall enjoy the right... to be confronted with the witnesses against him."  U.S. Const.

27   Amend. VI.  The Supreme Court held in Crawford v. Washington, 541 U.S. 36, 53-54 (2004),

28   that this provision bars "admission of testimonial statements of a witness who did not appear at

28

trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." However, "[t]he [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 59 n. 9.

"[T]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (internal citations and quotation marks omitted) (emphasis in original). Significantly, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Id. at 679 (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis omitted).

A declarant who validly asserts her Fifth Amendment right against self-incrimination is legally "unavailable" within the meaning of the Confrontation Clause. California v. Green, 399 U.S. 149, 168 n. 17 (1970). The record reflects that the trial court correctly found that T.L. was unavailable after she asserted her Fifth Amendment right against self-incrimination. Accordingly, admission of T.L.'s preliminary hearing testimony did not violate petitioner's right to confrontation.[5]

Admission of petitioner's "innocent tickling" statement, through T.L.'s preliminary hearing testimony, also raises no Confrontation Clause issue. U.S. v. Crowe, 563 F.3d 969, 976 n. 12 (9th Cir. 2009) ("Crowe does not explain how her own out-of-court statements raise hearsay or Confrontation concerns…"); United States v. Nazemian, 948 F.2d 522, 525-26 (9th Cir. 1991) ("If the statements properly are viewed as Nazemian's own, then there would be no confrontation clause issue since Nazemian cannot claim that she was denied the opportunity to confront herself."); United States v. Moran, 759 F.2d 777, 786 (9th Cir. 1985) ("Since the out of court statements ... were made by Moran himself, he can claim no confrontation clause violation."); Teofilo v. Anglea, 2021 WL 7967621, at *13 (C.D. Cal. Oct. 15, 2021) ("Petitioner had no confrontation rights with respect to his own statements."), report and recommendation accepted

---

[5] This Court observes that preliminary hearing testimony is admissible so long as the witness is unavailable *and* the defendant had an adequate opportunity to cross-examine the witness. Crawford, 541 U.S. at 58. The transcript from the preliminary hearing reflects that petitioner's counsel had an adequate opportunity to cross-examine T.L.

1    by, 2022 WL 1032394 (C.D. Cal. Apr. 4, 2022); Russell v. Madden, 2020 WL 6106315, at *9

2    n.15 (C.D. Cal. Aug. 25, 2020) ("Evidence of statements by Petitioner do not implicate the

3    Confrontation Clause."), report and recommendation accepted by, 2021 WL 2634678 (C.D. Cal.

4    June 25, 2021).[6]

5                              3.   Ineffective Assistance of Counsel Claim

6            The two prong Strickland standard governing ineffective assistance of counsel claims is

7    well known and often cited.  Strickland v. Washington, 466 U.S. 668, 692, 694 (1984).  It

8    requires petitioner to establish (1) that counsel's representation fell below an objective standard of

9    reasonableness; and (2) that counsel's deficient performance prejudiced the defense.  Id.

10           "The question is whether an attorney's representation amounted to incompetence under

11   'prevailing professional norms,' not whether it deviated from best practices or most common

12   custom."  Richter, 562 U.S. 86, 105 (2011) (citing Strickland, 466 U.S. at 690).  However,

13   "courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts

14   the available evidence of counsel's actions."  Id. at 109 (quoting Wiggins v. Smith, 539 U.S. 510,

15   526-27 (2003)).  Prejudice is found where "there is a reasonable probability that, but for counsel's

16   unprofessional errors, the result of the proceeding would have been different.  Strickland, 466

17   U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the

18   outcome."  Id.  "That requires a 'substantial,' not just 'conceivable,' likelihood of a different

19   result."  Cullen v. Pinholster, 563 U.S. at 170, 189 (2011) (quoting Richter, 562 U.S. at 112).

20           In reviewing a Strickland claim under AEDPA, the federal court is "highly deferential" in

21   determining whether counsel's challenged conduct was deficient.  Richter, 562 U.S. at 105.

22

23   [6] In the answer, respondent also argues that petitioner's innocent-tickling statement did not
     violate the Confrontation Clause because it was not admitted to prove the truth of the matter
24   asserted.  (ECF No. 35 at 34.)  Respondent argues that the prosecutor asked T.L. whether she
     knew that petitioner made the innocent-tickling statement.  (Id.)  Respondent argues that the
25   prosecutor was not trying to prove that petitioner did not innocently tickle, but instead sought
     T.L.'s knowledge on the matter.  (Id.)  Respondent argues that the question was aimed at
26   clarifying T.L.'s memory of the events, not petitioner's state of mind.  (Id.)  This Court need not
     determine whether the prosecutor offered petitioner's innocent-tickling statement for the truth of
27   the matter because it is clear that admission of petitioner's innocent-tickling statement did not
     violate the Confrontation Clause for the reasons set forth above.
28

1     "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The

2     question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s

3     deferential standard." <u>Id.</u>

4            Petitioner argues that trial counsel was ineffective for failing to prepare and investigate the

5     preliminary hearing transcripts.  (ECF No. 9 at 16.)  In support of this argument, petitioner argues

6     that trial counsel should have objected to admission of his innocent-tickling statement.  (<u>Id.</u>)  This

7     Court finds that trial counsel was not ineffective for failing to object to admission of petitioner's

8     innocent-tickling statement on the grounds that it violated petitioner's right to confrontation

9     because such an objection would have been overruled for the reasons discussed above.

10            In the answer, respondent argues that there was no basis in state law for trial counsel to

11     object to the innocent-tickling statement.  (ECF No. 35 at 35.)  In support of this argument,

12     respondent cites California Evidence Code § 1220: "Evidence of a statement is not made

13     inadmissible by the hearsay rule when offered against the declarant in an action to which he is a

14     party…"  It is not clear to this court that petitioner's innocent-tickling statement was offered

15     against petitioner.  For this reason, this court is not persuaded by respondent's citation to

16     California Evidence Code § 1220.

17            Assuming trial counsel could have raised a meritorious state law objection to admission of

18     petitioner's innocent-tickling statement, this Court finds that petitioner suffered no prejudice.

19     The evidence against petitioner was strong.  In T.L.'s preliminary hearing testimony read to the

20     jury, T.L. recanted her accusations against petitioner.  However, the credibility of T.L.'s

21     recantation was undermined by evidence that her mother, K.R., prepared the recantation letter,

22     that K.R. and T.L. fought over the letter, and K.R.'s continued relationship with petitioner.  In

23     addition, in her preliminary hearing testimony, T.L. described her previous accusations against

24     petitioner.  T.L.'s description of petitioner's assaults in her preliminary hearing testimony was

25     consistent with her description of the assaults she made to Officer Coletti and Detective

26     Peckinpaugh.  Witness Keathley also testified that K.R. told Keathley that petitioner admitted

27     molesting T.L.  The jury also heard evidence that petitioner engaged in three prior uncharged acts

28     of sexual misconduct against other minor girls.  Considering all of the evidence pointing toward

1    petitioner's guilt, this Court finds that there is no reasonable probability that the outcome of the

2    trial would have been different had petitioner's innocent-tickling statement been excluded.

3                           4.   Conclusion

4            After independently reviewed the record, this Court finds that the California Supreme

5    Court's denial of petitioner's Confrontation Clause and ineffective assistance of counsel claims

6    raised in claim 4 was not contrary to or an unreasonable application of clearly established

7    Supreme Court authority.  Accordingly, claim 4 should be denied.

8            **E.       Claim 5: Alleged Violation of <u>Miranda</u> and Ineffective Assistance of Counsel**

9            Petitioner argues that the trial court should have excluded his innocent tickling statement

10   because it was made in violation of <u>Miranda</u>.  (ECF No. 9 at 17-18.)  Petitioner also argues that

11   trial counsel was ineffective for failing to object to admission of his innocent tickling statement

12   based on <u>Miranda</u>.  (<u>Id.</u>)

13           Petitioner's <u>Miranda</u> claim is arguably procedurally defaulted because the Amador County

14   Superior Court implicitly denied this claim by citing <u>In re Harris</u>, 5 Cal.4th 813, 829 (1993) and

15   <u>In re Dixon</u>, 41 Cal.2d 756, 759 (1953).  (ECF No. 34-21.)  <u>Harris</u> and <u>Dixon</u> signal that the court

16   denied a claim on the grounds that the claim could have been raised on direct appeal but was not.

17   <u>Thomas v. Houston</u>, 2023 WL 7093736, at *10 (C.D. Cal. Sept. 22, 2023), adopted by 2023 WL

18   7094548 (C.D. Cal. Oct. 23, 2023).  The Supreme Court held that a claim barred by <u>Dixon</u> is

19   subject to procedural default.  <u>Johnson v. Lee</u>, 578 U.S. 605, 609 (2016) (<u>Dixon</u> bar qualifies as

20   an adequate bar to federal habeas review).  Respondent does not argue that petitioner's <u>Miranda</u>

21   claim is procedurally barred.

22           In the interests of judicial economy, this Court herein considers the merits of petitioner's

23   <u>Miranda</u> claim because the issue on the merits of this claim is clear and it is not clear whether this

24   claim is procedurally barred.  <u>See Lambrix v. Singletary</u>, 520 U.S. 518, 524-25 (1997) (noting

25   that interests of judicial economy allow federal courts to address merits of allegedly defaulted

26   claim if issue on the merits is clear but procedural default issues are not).  Because it is not clear

27   whether any state court reviewed the merits of petitioner's <u>Miranda</u> claim, in an abundance of

28   caution, this court conducts a de novo review of this claim.  <u>Stanley</u>, 633 F.3d at 860.

1    Petitioner raised the ineffective assistance of counsel claim raised in claim 5 in his second

2    habeas corpus petition filed in the California Supreme Court.  (ECF No. 34-30 at 10.)  Because no

3    state court issued a reasoned decision on the merits of this claim, this Court independently

4    reviews the record to determine whether habeas corpus relief is available under 28 U.S.C.

5    § 2254(d) as to this claim.  Stanley, 633 F.3d at 860.

6                    1.    Legal Standard for Miranda Claim

7    The Fifth Amendment provides that "no person shall be compelled in any criminal case to

8    be a witness against himself."  U.S. Const. amend. V.  A suspect subject to custodial interrogation

9    has a Fifth Amendment right to consult with an attorney, and the police must explain this right

10   prior to questioning.  Miranda 384 U.S. at 469-73.  In Miranda, the United States Supreme Court

11   held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory,

12   stemming from custodial interrogation of the defendant unless it demonstrates the use of

13   procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at

14   444.  To this end, custodial interrogation must be preceded by advice to the potential defendant

15   that he or she has the right to consult with a lawyer, the right to remain silent and that anything

16   stated can be used in evidence against him or her.  Id. at 473-74.

17   Error in admitting statements obtained in violation of Miranda is deemed harmless for

18   purposes of federal habeas review unless the error "had substantial and injurious effect or

19   influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993);

20   Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002) ("The erroneous admission of

21   statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error

22   analysis.").

23                   2.   Analysis—Miranda Claim

24   Assuming that petitioner's innocent tickling statement was admitted in violation of

25   Miranda, this error was harmless because it did not have a substantial and injurious effect or

26   influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637; Ghent, 279 F.3d at 1126.

27   As discussed in the section above addressing the ineffective assistance of counsel claim raised in

28   claim 4, the evidence against petitioner was strong.  For this reason, this Court finds that the

33

1     outcome of the trial would not have been different had petitioner's innocent-tickling statement

2     been excluded.  Assuming that admission of petitioner's innocent-tickling statement violated

3     <u>Miranda</u>, the error was harmless.

4         Having conducted a de novo review of the record, this Court finds that petitioner's

5     <u>Miranda</u> claim is without merit.  Accordingly, petitioner's <u>Miranda</u> claim should be denied.[7]

6                 3.   <u>Analysis—Ineffective Assistance of Counsel Claim</u>

7         Petitioner argues that trial counsel was ineffective for failing to object to admission of his

8     innocent-tickling statement based on <u>Miranda</u>.  Assuming trial counsel could have raised a

9     meritorious <u>Miranda</u> objection to admission of petitioner's innocent-tickling statement, this Court

10    finds that petitioner suffered no prejudice.  As discussed above in the analysis of petitioner's

11    ineffective assistance of counsel claim raised in claim 4, there is no reasonable probability that

12    the outcome of petitioner's trial would have been different had the innocent-tickling statement

13    been excluded.  For this reason, the ineffective assistance of counsel claim raised in claim 5 is

14    also without merit.

15         After independently reviewing the record, this Court finds that the California Supreme

16    Court's denial of this ineffective assistance of counsel claim was not contrary to or an

17    unreasonable application of clearly established Supreme Court authority.  Accordingly, this

18    ineffective assistance of counsel claim should be denied.

19      **F.**      **Claims 6-14, 18, 20: Alleged Ineffective Assistance of Trial Counsel**

20              1.   <u>Standard of Review</u>

21

22    [7] In the answer, respondent contends that the California Supreme Court could have denied
petitioner's <u>Miranda</u> claim based on the lack of evidentiary record to support the claim.  (ECF

23    No. 35 at 36.)  Respondent contends that the California Supreme Court could have decided that
petitioner's failure to seek a suppression hearing at trial resulted in a lack of proof of preliminary

24    facts to warrant relief.  (<u>Id.</u>)  This Court finds, however, that the record does not reflect that the
California Supreme Court denied petitioner's <u>Miranda</u> claim on these grounds.  Applying the

25    "look through" doctrine, the record suggests that the California Supreme Court more likely
denied petitioner's <u>Miranda</u> claim based on petitioner's failure to raise this claim on direct appeal.

26    <u>See Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991) ("look through" applies where a silent
state appellate court order follows lower court's imposition of procedural default); ECF No. 34-

27    21 (order by Amador Superior Court citing <u>In re Harris</u>, 5 Cal.4th 843, 829 (1993) and <u>In re</u>

28    <u>Dixon</u>, 41 Cal.2d 756, 759 (1953)).

No state court issued a reasoned decision addressing any of petitioner's ineffective assistance of trial counsel claims.  Accordingly, this Court independently reviews the record to determine whether habeas corpus relief is available under 28 U.S.C. § 2254(d) as to the ineffective assistance of trial counsel claims raised in claims 6-14, 18, 20.  Stanley, 633 F.3d at 860.

### 2.   Legal Standard

The legal standard for evaluating ineffective assistance of counsel claims is set forth in the section addressing petitioner's ineffective assistance of counsel claim raised in claim 4.

### 3.   Claim 6

In the petition, petitioner argued that trial counsel was ineffective for failing to object to the reading of T.L.'s preliminary hearing testimony to the jury.  (ECF No. 9 at 18.)  In the traverse, petitioner clarifies that he is arguing that trial counsel was ineffective for failing to object to the prosecutor reading T.L.'s preliminary hearing testimony to the jury.  (ECF No. 38 at 17.)  Petitioner argues that the prosecutor "portrayed herself as the complaining witness, answering questions and with every answer looking at the jury to add her (prosecutor's) own emotion into the reading of the answers."  (Id.)

In claim 6, petitioner also argues that trial counsel was ineffective for failing to request a jury instruction advising that the jury should not judge T.L.'s credibility based on the person reading the preliminary hearing transcript but on T.L.'s words.  (ECF No. 9 at 18.)

#### a.   Background

As discussed above, T.L.'s preliminary hearing testimony was read to the jury.  The prosecutor read T.L.'s testimony.  (ECF No. 34-2 at 9.)  Petitioner's trial counsel read the defense attorney's cross-examination questions.  (Id.)  A male member of the prosecutor's office (Mr. Trudgen) read the prosecutor's questions.  (Id.)  There were no objections to this procedure.

The trial court proposed instructing the jury not to judge the credibility of T.L.'s preliminary hearing testimony based on the person reading it:

> Trial Court: All right.  I assume you'd want an admonition that they're not to judge the credibility based upon the person reading it but based upon the words itself.

1

Trial Counsel: I do, indeed.  I want the jury to know that the spoken words are the evidence.

2

Trial Court: Right. I think that's an accurate admonition, and the Court would intend to provide them that.

3

4

(ECF No. 34-1 at 279.)

5

However, this jury instruction proposed by the trial court, and agreed to by trial counsel, was not read to the jury.

6

7

*b.*        Analysis

8

This Court first considers petitioner's claim that trial counsel was ineffective for failing to

9

object to the prosecutor reading T.L.'s preliminary hearing testimony.  This Court is aware of no

10

clearly established Supreme Court authority or California law holding that prosecutors are per se

11

prohibited from reading a victim's preliminary hearing testimony at trial.  Petitioner cites no

12

authority in support of this claim.  After reviewing the record, this Court finds no grounds on

13

which trial counsel could have raised a meritorious objection to the prosecutor's reading of T.L.'s

14

preliminary hearing testimony.  The record contains no evidence, for example, that the prosecutor

15

attempted to inappropriately influence the jury by her reading of the transcript.  Petitioner's claim

16

that the prosecutor "portrayed herself as the complaining witness, answering questions and with

17

every answer looking at the jury to add her (prosecutor's) own emotion into the reading of the

18

answers," does not demonstrate that the prosecutor acted inappropriately in her reading of T.L.'s

19

preliminary hearing testimony.  For these reasons, this Court finds that trial counsel was not

20

ineffective for failing to object to the prosecutor reading T.L.'s preliminary hearing testimony at

21

trial.

22

For the following reasons, this Court finds that petitioner was not prejudiced by trial

23

counsel's failure to follow through on his request for the jury to receive an instruction not to

24

judge T.L.'s preliminary hearing testimony based on the person reading it.  As stated above, the

25

record contains no evidence that the prosecutor attempted to influence the jury by her reading of

26

the transcript.  In addition, the jury was advised with CALCRIM No. 105: "In deciding whether

27

testimony is true and accurate, use your common sense and experience."  (ECF No. 34-6 at 137.)

28

While this instruction did not specifically advise the jury not to judge the credibility of T.L.'s

36

testimony based on the person reading it, a reasonable jury would understand this instruction to advise that the credibility of T.L.'s preliminary hearing testimony should be based on her words and not the reader.   For these reasons, this Court finds that there is no reasonable probability that the outcome of petitioner's trial would have been different had the jury been instructed to judge the credibility of T.L.'s preliminary hearing testimony based on her words and not on the reader.

After independently reviewing the record, this court finds that the California Supreme Court's denial of the ineffective assistance of counsel claims raised in claim 6 was not contrary to or an unreasonable application of clearly established Supreme Court authority.  Accordingly, claim 6 should be denied.

4.    Claim 7

In claim seven, petitioner argues that trial counsel was ineffective for failing to subpoena his and Keathley's phone records, in support of his alibi defense.  (ECF No. 9 at 19.)  Petitioner claimed that these phone records would demonstrate that he was not in the county at the time of the first assault.  (Id.)  However, in the traverse, petitioner claims that his and Keathley's phone records had "nothing to do" with an alibi defense  (ECF No. 38 at 21.)  In the traverse, petitioner claims that Virginia Hill's text messages would have provided his alibi defense.  (Id. at 20-21.)  In claim seven, petitioner also argues that trial counsel was ineffective for failing to obtain evidence that would have impeached Keathley.  (ECF No. 9 at 19.)

a.    Trial Counsel's Alleged Failure to Subpoena Phone Records re:
Alibi

This Court first discusses the background of petitioner's alibi defense to put in context his claim regarding trial counsel's alleged failure to subpoena Virginia Hill's text messages.  This claim concerns the first assault of T.L., which occurred in the early morning hours of March 14, 2015.

In her preliminary hearing testimony, read at trial, T.L. testified that she recalled telling Deputy Coletti that the first incident occurred between 1:00 and 2:00 in the morning.  (ECF No. 34-2 at 42.)  She recalled telling another officer that the incident occurred "right before 2:00 to 2:30."  (Id. at 43.)  T.L. also testified that she told an officer that she thought she heard sexual acts

37

1    between petitioner and Keathley, apparently after the assault.  (Id. at 45.)

2           At trial, K.R. testified that in March 2015, she worked in Valley Springs as a bartender at

3    The Smokehouse.  (Id. at 69.)  K.R. testified that her shift at The Smokehouse ended at about 1:30

4    a.m. on the morning of March 14, 2015.  (Id. at 70.)  K.R. testified that petitioner and his cousin,

5    Virginia Hill, came to The Smokehouse around 7:00 p.m. on March 13, 2015.  (Id.)  Petitioner

6    stayed at The Smokehouse until K.R. got off duty.  (Id. at 71.)  After getting off duty, K.R. and

7    petitioner drove to the Buena Vista Bar to pick up petitioner's car (a Suburban).  (Id.)  This drive

8    took 35 to 40 minutes.  (Id.)  From the Buena Vista Bar to petitioner's house, where K.R. and

9    T.L. were living, is about a five-minute drive.  (Id. at 72.)

10          K.R. testified that when she and petitioner arrived at petitioner's home, she got in the

11   shower.  (Id. at 72.)  K.R. testified that she was in the shower for eight minutes.  (Id. at 74.)

12   When she got in the shower, petitioner was sitting on the bed.  (Id. at 75.)  When she got out of

13   the shower, petitioner was in bed.  (Id.)  At some later time, petitioner received a text message.

14   (Id.)  Petitioner then stated that he had to turn the light off in his car.  (Id. at 76.)  K.R. testified

15   that petitioner left the room and returned in five minutes or less.  (Id.)  K.R. testified that she and

16   petitioner then went to sleep.  (Id.)  K.R. testified that petitioner did not leave the bedroom after

17   that until the following morning.  (Id.)

18          At trial, K.R. also testified that, during an interview with Detective Peckinpaugh, she

19   stated that she got off from work at about 1:30 a.m. on March 14, 2015.  (Id. at 94.)  She told

20   Detective Peckinpaugh that she arrived home at around 2:00 a.m.  (Id.)

21          Keathley testified that on the morning of March 14, 2015, petitioner and K.R. arrived

22   home at 2:00 or 2:15 a.m. or possibly 2:30 a.m.  (Id. at 271.)  Keathley testified that it was after

23   2:00 a.m. when K.R. and petitioner arrived home.  (Id.)  At that time, Keathley was asleep on the

24   couch.  (Id.)  At some later time, Keathley heard someone banging on the door because they left

25   the light on inside of the truck.  (Id. at 272.)  Keathley informed petitioner by text that he had left

26   the light on in the truck.  (Id.)  Keathley saw petitioner go outside and heard him return.  (Id.)

27   Keathley testified that she did not know where petitioner went when he returned to the house.

28   (Id. at 273.)

1    Detective Peckinpaugh testified that he spoke with T.L. and K.R. on March 18, 2015.  (Id.

2    at 181.)  Detective Peckinpaugh testified that K.R. told him that on March 14, 2015, she arrived

3    home at approximately 2:00 a.m.  (Id. at 189.)  Detective Peckinpaugh testified that K.R. told him

4    that she did not recall what time petitioner returned after turning the light off in his car because

5    she was asleep.  (Id. at 190.)

6    During closing argument, petitioner's counsel argued that it was impossible for petitioner

7    to have been at home during the time of the first incident.  (ECF No. 34-3 at 131-32.)  Trial

8    counsel argued that K.R. left the bar at 2:00 a.m. because that is the time bars close, and it took 30

9    to 35 minutes for K.R. and petitioner to drive home from the bar.  (Id. at 131-32.)  Trial counsel

10   argued that T.L. claimed the first incident occurred from 2:00 a.m. to 2:30 a.m.  (Id. at 132.)  Trial

11   counsel argued that at the time T.L. testified petitioner assaulted her, petitioner was driving home

12   from the bar with K.R.  (Id.)

13    Turning to the merits of petitioner's claim, petitioner appears to argue that text messages

14   between petitioner and Hill would show that petitioner arrived home after 2:30 a.m., which is

15   after the latest time T.L. estimated the assault occurred.[8]   In support of this claim, petitioner

16   refers to two documents attached to the petition.  The first document is a letter to petitioner's trial

17   counsel from Haley Investigations dated March 24, 2016.  (ECF No. 9 at 58.)  This letter

18   describes a telephone conversation between Haley Investigations and Hill on or around February

19   24, 2016.  (Id.)  Hill stated that on St. Patrick's Day 2015, she was at the Buena Vista Bar with

20   petitioner and at around 9:30 p.m. they decided to go to The Smokehouse.  (Id. at 59.)  They

21   drove together in Hill's car.  (Id.)  Hill stated that she stayed until about 1:30-1:40 a.m.  (Id.)

22   Petitioner walked her to her car because he wanted to get his jacket.  (Id.)  She did not know what

23   time petitioner and K.R. left The Smokehouse.  (Id.)  Hill later texted petitioner to let him know

24

---

25   [8]    In the answer, respondent argues that petitioner claims that counsel should have done more to
     prove that petitioner did not arrive home before 2:00 a.m. on March 14, 2015.  (ECF No. 35 at
26   43.)  This Court understands petitioner's alibi defense to be that he did not arrive home until after
     2:30 a.m. on March 14, 2015.  As discussed above, evidence was presented that the assault could
27   have occurred as late as approximately 2:30 a.m.  In support of the alibi defense, trial counsel
     argued that K.R. and petitioner left The Smokehouse at 2:00 a.m., putting petitioner at home after
28   2:30 a.m.

1  that she got home o.k.  (Id.)  Petitioner texted back, "love you."  (Id.)  Petitioner did not state

2  where he was at the time of the text.  (Id.)

3      The second document is an undated letter addressed to "Judge" from Virginia Hill.  (Id. at

4  60.)  In this letter, Hill states that on the "night of the accusation," she decided to leave the bar at

5  about 1:30 a.m.  (Id.)  She asked petitioner if he wanted to go with her and he said no, he wanted

6  to stay with K.R.  (Id.)  The letter then states, "I texted petitioner about 2 a.m. and told him I was

7  home and he responded back saying OK he was about to leave with [K.R.]."  (Id.)

8      For the following reasons, this Court finds that trial counsel was not ineffective for failing

9  to subpoena Hill's text messages with petitioner from March 14, 2015.  First, petitioner fails to

10  provide the court with these text messages.  Second, the letters referred to by petitioner in support

11  of this claim do not demonstrate that Hill was able to provide a credible alibi for petitioner.  The

12  March 2016 letter from Haley Investigations states that Hill did not know when petitioner and

13  K.R. left The Smokehouse and that petitioner's text to her did not state where petitioner was

14  when he sent it.  Hill contradicted these statements in her undated letter to "Judge," where she

15  stated that petitioner texted her at 2:00 a.m. that he was about to leave the Smokehouse with

16  K.R.[9]  These contradictory statements by Hill do not show that she could have provided a

17  credible alibi for petitioner.  Accordingly, this Court finds that petitioner was not prejudiced by

18  trial counsel's failure to subpoena the text messages between Hill and petitioner in support of his

19  alibi defense.

20          b.     *Trial Counsel's Alleged Failure to Obtain Evidence to Impeach*

21                 *Keathley*

22      Petitioner argues that trial counsel was ineffective for failing to present evidence

23  impeaching the credibility of prosecution witness Keathley.  At trial, Keathley provided

24  incriminating testimony against petitioner, including her testimony that about two weeks or so

25  after the incident, K.R. told Keathley that petitioner admitted to K.R. that he molested T.L.  (ECF

26  No. 34-2 at 274.)

27  —————————————————

28  [9] There is also no evidence that trial counsel knew of the undated letter addressed to "Judge."

1    Petitioner argues that Keathley was motivated to lie at trial because Keathley had a sexual

2 relationship with petitioner but wanted a romantic relationship, which petitioner rejected.  (ECF

3 No. 9 at 19.)  In support of this claim, petitioner cites text messages purportedly between

4 petitioner and Keathley during June 2015.  (ECF No. 9 at 40-44.)  A text message from Keathley

5 to petitioner stated, "I will do want [sic] I can for u sweetie anything u need I'm here for you."

6 (Id. at 40.)  In another text message addressed to petitioner, Keathley wrote, "That's good:) do u

7 still need me to write u a statement meant for court…ok whatever u need I got ur back…UR

8 welcome my friend."  (Id. at 44.)

9    This Court agrees with respondent that the evidence that Keathley was motivated to lie

10 because she wanted a romantic relationship with petitioner was thin.  This Court also agrees with

11 respondent that evidence that petitioner cheated on K.R. with Keathley could have negatively

12 impacted petitioner's credibility.  In addition, trial counsel used T.L.'s fear of petitioner's affair

13 with Keathley to attack T.L.'s credibility.  T.L. testified in the preliminary hearing that she told

14 one of the officers investigating the case that she thought petitioner and Keathley were having sex

15 because she heard sexual acts coming from the area where Keathley slept after the first incident.

16 (ECF No. 34-2 at 45.)  Keathley testified that she did not have a romantic relationship with

17 petitioner.  (Id. at 269.)  During his closing argument, trial counsel challenged T.L.'s credibility

18 based on Keathley's testimony denying a romantic relationship with petitioner.  (ECF No. 34-3 at

19 123-24.)  This Court agrees with respondent that reasonable trial counsel could conclude that in

20 the absence of better evidence of Keathley's motivation to lie, it benefitted petitioner more to

21 have the jury believe petitioner was faithful to K.R., and T.L.'s theory that petitioner was

22 cheating was a basis to disbelieve T.L.  For these reasons, this Court finds that trial counsel was

23 not ineffective for failing to impeach Keathley with the text messages discussed above.

24    Petitioner argues that trial counsel could have impeached Keathley with a text message,

25 dated June 17, 2015, allegedly demonstrating Keathley's dislike of K.R.: "Called the sheriff on ur

26 bitch girlfriend in [sic] done."  (ECF No. 9 at 42.)  This Court agrees with respondent that the text

27 message expressing Keathley's frustration with K.R. and calling law enforcement could have

28 reflected Keathley's frustration with T.L.'s frequent fights with her mother K.R. while living with

41

1    Keathley, which were apparently prompted by K.R.'s continued contact with petitioner and

2    K.R.'s efforts to get T.L. to recant.  At trial, Keathley testified that after K.R. and T.L. moved in

3    with her, she heard K.R. and T.L. fighting.  (ECF No. 34-2 at 275.)  Keathley testified that she

4    saw K.R. and T.L. arguing over a letter.  (Id. at 277.)  Keathley testified, "T.L. was in tears,

5    screaming and crying.  And [K.R.] was just – you know, she was set in stone what she wanted to

6    say.  And it didn't matter what T.L. felt.  It just didn't matter." (Id.)  This Court agrees with

7    respondent that it would have been reasonable for trial counsel to have decided not to impeach

8    Keathley with her text message regarding calling law enforcement in order to avoid the damaging

9    topic of the K.R.'s efforts to get T.L. to recant and K.R.'s continued contact with petitioner.

10           Petitioner also appears to argue that trial counsel was ineffective for failing to impeach

11   Keathley with text messages demonstrating that Keathley falsely testified that K.R. told her that

12   petitioner admitted molesting T.L.  In support of this claim, petitioner attaches text messages

13   from June 16, presumably 2015, purportedly from K.R. to Keathley.[10]  (ECF No. 9 at 46.)  K.R.

14   texted, "There's no reason for it.  It's harassment. We have already told them nothing happened.

15   And she doesn't want to talk about it, she feels bad." (Id.)  K.R. also texted, "Well it didn't

16   happen so that's gotta count for something.  I'm pissed and don't want to talk about that.  I just

17   wanted to know if shit worked out with your mom." (Id.)  Petitioner appears to argue that K.R.'s

18   texts stating that petitioner did not molest T.L. undermine the credibility of Keathley's testimony

19   that K.R. told Keathley that petitioner admitted molesting T.L.

20           K.R.'s June 2015 text stating that petitioner did not molest T.L. was inconsistent with

21   Keathley's testimony that K.R. told her that petitioner admitted molesting T.L.  However, most, if

22   not all, of K.R.'s behavior and statements after March 17, 2015 were inconsistent with K.R.

23   having been told by petitioner that he admitted molesting T.L.[11]  K.R. did not testify at trial that

24   petitioner admitted to her that he molested T.L.

25   _____

26   [10] In the traverse, petitioner clarifies that the text messages discussed in this claim are from K.R. to Keathley.  (ECF No. 38 at 19.)

27   [11] Detective Peckinpaugh testified that K.R. delivered the recantation letter to the Sheriff's Office on March 19, 2015.  (ECF No. 34-2 at 194-95.)  Keathley testified that, approximately two weeks

28   after March 17, 2015, K.R. told her that petitioner admitted molesting T.L. (Id. at 274.)

1    This Court also observes that trial counsel went on to cross examine Keathley to elicit

2  testimony from Keathley that she waited roughly seven months after K.R. told her about

3  petitioner's admission before Keathley informed law enforcement:

> Q: Anyway, so here it is, Aroz molested the girl. You're mad about
> it. The girl's mother confirms it. Why didn't you go to law
> enforcement and say, hey, guess what I heard about this case?
>
> A: I already made a police report. And I just assumed that they would
> take care of it. I worked 12 hours a day, you know.
>
> Q: I understand, but the first time you spoke to law enforcement in
> this matter was roughly November 2nd of 2015; isn't that right?
>
> A: Yeah, roughly.
>
> Q: Okay. I have got to move to look at my notes.
>
> A: Okay.
>
> Q: And that is the first time, is it not, that you disclosed to law
> enforcement this submission Aroz made to Rueda that she told you
> about, right?
>
> A: Yes.
>
> Q: Okay. So that was roughly eight months. Well, let's be fair. That
> was roughly seven months after Rueda told you what she told you
> that you told law enforcement, right?
>
> A: Yes.
>
> Q: And you didn't go to law enforcement. Law enforcement came
> to you, right?
>
> Prosecutor: Objection, asked and answered.
>
> Trial Court: Overruled.
>
> Q: In other words, you didn't volunteer this statement? You were
> interviewed by then Detective Peckinpaugh of the Amador County
> Sheriff's Department?
>
> A: Yes.

25  (ECF No. 34-2 at 283-84.)

26    Keathley's testimony that K.R. told Keathley that petitioner admitted to molesting T.L.

27  was challenged by trial counsel's cross-examination of Keathley, set forth above, and by K.R.'s

28  statements and conduct after March 17, 2015. Based on this impeachment evidence, there is no

1  reasonable probability that the outcome of the trial would have been different had trial counsel

2  further impeached Keathley with the at-issue texts.

3      Petitioner also argues that trial counsel was ineffective for failing to impeach Keathley

4  with her prior convictions.  Citing exhibits D and E, petitioner argues that Keathley "has a

5  reputation that is well documented of being a liar."  (ECF No. 9 at 19.)  Exhibit D includes

6  records showing that on October 27, 2015, charges against Keathley for attempting to dissuade a

7  witness were dismissed.  (Id. at 49-50.)  Exhibit E includes records showing that in 2012,

8  Keathley pleaded no contest to "false report of a criminal offense."  (Id. at 51.)

9      At trial, Keathley admitted that she had prior convictions for "something involving a

10  check," "something with theft involving an elderly person," filing a false report and a recent

11  conviction for theft from an elderly person.  (ECF No. 34-2 at 278.)  Based on this testimony, the

12  jury heard evidence of Keathley's false report conviction cited in Exhibit E.  Because the jury

13  heard evidence of Keathley's criminal record, this court finds that petitioner's claim that counsel

14  was ineffective for failing to impeach Keathley with her criminal record is without merit.

15                    *c.*    *Conclusion*

16      After independently reviewed the record, this court finds that the California Supreme

17  Court's denial of the ineffective assistance of counsel claims raised in claim 7 was not contrary to

18  or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

19  claim 7 should be denied.

20              5.    Claim 8

21      Petitioner argues that trial counsel was ineffective for failing to present video surveillance

22  evidence that would have impeached Keathley's testimony that she drove with K.R. to the

23  Amador County Sheriff's Department to deliver T.L.'s recantation letter.  (ECF No. 9 at 20.)

24  Petitioner argues that video footage from the Amador County Sheriff's Department would have

25  shown that Keathley was not with K.R. when she delivered the letter.  (Id.)  This Court first

26  discusses the background to this claim.

27      At trial, Keathley testified that she told Detective Peckinpaugh that she was with K.R. one

28  of the times K.R. went to the Sheriff's Department.  (ECF No. 34-2 at 284.)  Keathley did not

1   identify the date she went with K.R. to the Sheriff's Department.  Keathley testified that K.R.'s

2   daughters were in the car with them.  (Id. at 285.)  Keathley testified that K.R. "left the car

3   carrying something" that appeared to be papers.  (Id.)  Keathley testified that she did not see K.R.

4   meet with Detective Peckinpaugh.  (Id.)  Keathley testified that when K.R. returned to the car, she

5   had documents with her.  (Id.)  Keathley did not know whether K.R. dropped any papers off at the

6   Sheriff's Office.  (Id.)

7       At trial, Detective Peckinpaugh testified that K.R. came to the Sheriff's Office on March

8   19, 2015 at approximately 4:00 p.m.  (Id. at 194.)  Detective Peckinpaugh testified that K.R.

9   arrived alone.  (Id.)  K.R. gave Detective Peckinpaugh the recantation letter.  (Id. at 194-95.)

10  K.R. herself testified that she when she went to the Sheriff's Office to deliver the recantation

11  letter, she was by herself.  (Id. at 127.)

12      Contrary to petitioner's claim, Keathley did not clearly testify that she was with K.R.

13  when K.R. delivered the recantation letter to the Amador County Sheriff's Department.  For this

14  reason, petitioner's claim alleging that trial counsel was ineffective for failing to impeach

15  Keathley's testimony that she was with K.R. when K.R. delivered the recantation letter is without

16  merit.

17      Moreover, this Court observes that petitioner apparently did not obtain or otherwise view

18  the video surveillance footage from the Amador County Sheriff's Department.  Petitioner's

19  speculation that the video surveillance footage exists and that it would support his claim that

20  Keathley was not with K.R. when she delivered the recantation letter is not sufficient to

21  demonstrate his counsel was ineffective for failing to obtain this video footage.  As other courts

22  have explained:

23          A habeas petitioner may not leave a court to speculate what evidence
            a purportedly deficient investigation would have discovered.  In
24          order to prevail on an allegation that defense counsel conducted an
            insufficient investigation resulting in ineffective assistance, the
25          petitioner must show specifically what that investigation would have
            produced.  A petitioner may not simply speculate about what a
26          witness's testimony would be or evidence would show, but must
            adduce evidence to show what it would have been, e.g. through
27          testimony or witnesses.

28  Witzig v. Shinn, 2022 WL 19395289, at *19 (D. Ariz. June 2, 2022), adopted by 2023 WL

1  2423313 (D. Ariz. Mar. 9, 2023) (citing <u>Grisby v. Blodgett</u>, 130 F.3d 365, 373 (9th Cir. 1997);

2  <u>U.S. v. Ashami</u>, 932 F.2d 643, 650 (7th Cir. 1991)).

3         After independently reviewing the record, this Court finds that the California Supreme

4  Court's denial of the ineffective assistance of counsel claim raised in claim 8 was not contrary to

5  or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

6  claim 8 should be denied.

7                    6.    <u>Claim 9</u>

8         Petitioner argues that counsel was ineffective for failing to "secure any kind of

9  declarations from any witnesses for alibi or impeachment testimony."  (ECF No. 9 at 20.)  Citing

10  exhibits I1-I5, petitioner claims that counsel subpoenaed several witnesses, but failed to interview

11  or get any kind of written declaration from these witnesses.  (<u>Id.</u>)  Petitioner claims that he,

12  petitioner, has "lost all of the evidence that would support these claims, as people's memory's

13  [sic] fade and sometimes the unfortunate happens when someone passes away without any kind

14  of record on what they witnessed."  (<u>Id.</u>)  Petitioner alleges that "[t]his happened to Mathew

15  Ninke, who was [petitioner's] retained counsel, before trial counsel James Clark.  As Mr. Ninke

16  had talked with 'T.L.' through a investigator, that Mr. Clark refused to interview or get any

17  investigator notes rendering him ineffective."  (<u>Id.</u>)

18         In the answer, respondent reasonably characterizes claim 9 as claiming that

19  memorialization of trial counsel's investigation would have proved helpful for petitioner's

20  collateral attack on his judgment.  This Court is not aware of any clearly established Supreme

21  Court authority recognizing an ineffective assistance of counsel claim based on trial counsel's

22  failure to create records that would aid a petitioner in their collateral attack on their judgment.

23         This Court observes that petitioner raises other claims in the instant petition based on the

24  alleged witnesses identified in the subpoenas attached as exhibits I1-I5.  Exhibit I1 is a subpoena

25  addressed to Mike Martin, Amador County District Attorney's Office.  (<u>Id.</u> at 61.)  Also attached

26  to exhibit I1 is a report prepared by Mike Martin regarding his investigation into text messages

27  between T.L. and Lukas Smith.  (<u>Id.</u> at 62-67.)  In claim 14, petitioner argues that trial counsel

28  was ineffective for failing to call Mike Martin as a witness, as promised in his opening statement.

1  In claim 16, petitioner also argues that the trial court erred in denying trial counsel's request to

2  call Mike Martin as a witness.  This Court finds that to the extent claim 9 argues that trial counsel

3  failed to investigate and present evidence related to Mike Martin and his report, this claim is

4  addressed in the discussion of claims 14 and 16.

5       Exhibit I2 includes subpoenas addressed to Rachael Delphin and Stacy Dalton.  (Id. at 68,

6  69.)  In claim 12, petitioner argues that trial counsel was ineffective for failing to impeach

7  Keathley's testimony with testimony from Delphin and Dalton.  This Court finds that to the

8  extent claim 9 argues that trial counsel failed to investigate and present testimony from Delphin

9  and Dalton to impeach Keathley, this claim is addressed in the discussion of claim 12.

10      Exhibit I5 is a subpoena addressed to Andrea Lynette Malaspino, who was incarcerated in

11  the Amador County Jail.  (Id. at 73.)  To the extent petitioner argues in claim 9 that trial counsel

12  was ineffective for failing to interview Malaspino, petitioner fails to describe any helpful

13  information trial counsel could have obtained from Malaspino.  In the traverse, petitioner states that

14  he can "only assume" what Malaspino would have testified to.  (ECF No. 38 at 25.)  Petitioner's

15  speculation that Malaspino would have provided helpful testimony is insufficient to demonstrate

16  that trial counsel was ineffective for failing to interview Malaspino.  See Bragg v. Galaza, 242 F.3d

17  1082, 1088 (9th Cir. 2001) (finding that mere speculation that witness might have given helpful

18  information if interviewed insufficient to establish ineffective assistance of counsel); Dows v.

19  Wood, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective assistance of counsel claim based

20  on counsel's failure to interview or call alibi witness because petitioner provided "no evidence that

21  this witness would have provided helpful testimony for the defense-i.e., Dows has not presented an

22  affidavit from this alleged witness").

23      Exhibit I4 is a subpoena addressed to Debbie Zachary.  (ECF No. 9 at 72.)  In the petition,

24  petitioner fails to describe any helpful testimony trial counsel could have obtained from Zachary.

25  In the traverse, petitioner states that Zachary was the one who knocked on petitioner's door on the

26  night of March 13-14, 2015.  (ECF No. 38 at 25.)  Petitioner argues that Zachary would have been

27  able to "clear up what time all this occurred regarding lights being on in the vehicle."  (Id.)

28  Petitioner is apparently claiming that Zachary, the neighbor who knocked on the door and advised

47

1    that the lights were on in petitioner's truck, could possibly have testified in support of his alibi

2    defense.  However, petitioner fails to demonstrate that Zachary had information helpful to his alibi

3    defense.  For this reason, petitioner's ineffective assistance of counsel claim based on trial counsel's

4    alleged failure to interview Zachary is without merit.  See Bragg, 242 F.3d at 1088; Dows, 211 F.3d

5    at 486.

6         Finally, in the traverse, petitioner states that retained attorney Ninke spoke with witness

7    Keathley: "What about?  No one will know, because Matt Ninke passed away in 2018."  (ECF

8    No. 38 at 25.)  To the extent petitioner argues that trial counsel Clark was ineffective for failing to

9    follow-up on Ninke's interview with Keathley, petitioner fails to demonstrate that Ninke obtained

10   any helpful information from Keathley.  Accordingly, this claim of ineffective assistance of

11   counsel is without merit.  See Bragg, 242 F.3d at 1088; Dows, 211 F.3d at 486.

12        After independently reviewing the record, this Court finds that the California Supreme

13   Court's denial of the ineffective assistance of counsel claims raised in claim 9 was not contrary to

14   or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

15   claim 9 should be denied.

16                    7.    Claim 10

17        Petitioner argues that trial counsel was ineffective for failing to call two alibi witnesses,

18   Virginia Hill and the bartender training K.R. on the night of March 13, 2015.  (ECF No. 9 at 21.)

19   In support of this claim, petitioner cites the two letters addressed in claim 7: the letter to trial

20   counsel from Haley Investigations describing a telephone conversation with Virginia Hill and

21   Virginia Hill's undated letter addressed to "Judge."  (Id. at 58-60.)

22        As set forth in the discussion of claim 7, the letters cited above do not demonstrate that

23   Hill was able to provide a credible alibi defense for petitioner.  Petitioner also fails to demonstrate

24   that the bartender training K.R. would have provided evidence helpful to petitioner's alibi

25   defense.  For these reasons, petitioner's claim that trial counsel was ineffective for failing to call

26   Virginia Hill and the bartender training K.R. as witnesses in support of his alibi defense is

27   without merit.  See Bragg, 242 F.3d at 1088; Dows, 211 F.3d at 486.

28        After independently reviewing the record, this Court finds that the California Supreme

1     Court's denial of the ineffective assistance of counsel claim raised in claim 10 was not contrary to

2     or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

3     claim 10 should be denied.

4             8.    Claim 11

5         Petitioner argues that trial counsel was ineffective for failing to "prepare and investigate

6     [petitioner's] case until one month before trial."  (ECF No. 9 at 21.)  Petitioner alleges that he did

7     not find out that trial counsel did not hire an investigator until one month before trial.  (Id.)

8     Petitioner argues that if trial counsel "would have acted properly, he could have gotten cellphone

9     records from Mr. Aroz to pinpoint his location, surveillance video from three different bars and

10     Shell gas station and text messages from Mrs. Keathley stating her romantic feelings for

11     [petitioner] and her wanting to live together."  (Id.)

12         In the answer, respondent reasonably construes claim 11 to allege that trial counsel had

13     insufficient time to prepare for trial, and that the insufficient preparation is evidenced by the

14     failure to secure the cell phone records, video surveillance, alibi witnesses and impeachment

15     information described in previous claims.  (ECF No. 35 at 47.)  Respondent observes that trial

16     counsel was aided by the efforts of law enforcement and previous counsel.  (Id.)  Trial counsel

17     also had his own investigator.  (Id.)  Respondent argues that petitioner does not prove that trial

18     counsel lacked sufficient time or resources, but instead appears to argue that the efforts trial

19     counsel took were insufficient.  (Id.)  In doing so, respondent argues, petitioner restates his

20     previous complaints in a speculative time-constraint context.  (Id.)

21         In the traverse, petitioner argues that he is not claiming that counsel lacked sufficient time

22     or resources to investigate his case.  (ECF No. 38 at 26.)  Instead, petitioner argues, he is claiming

23     that trial counsel failed to use his time and resources adequately.  (Id.)

24         Two of the arguments raised in claim 11 were raised in claim 7.  This Court finds that

25     claim 11 restates petitioner's claims that trial counsel was ineffective for failing to obtain

26     petitioner's text messages with Virginia Hill in support of his alibi defense and for failing to

27     obtain Keathley's text messages showing her romantic feelings for petitioner, raised in claim 7.

28     Accordingly, this Court will not address these claims again.

Claim 11 raises one claim not previously raised:  trial counsel was ineffective for failing to obtain surveillance video from three different bars and a Shell gas station.  This court finds that petitioner fails to demonstrate that surveillance video from the three bars and Shell gas station would have helped his defense.  Petitioner's speculation regarding what the surveillance video would show does not demonstrate ineffective assistance of counsel.  See Witzig, 2022 WL 19395289, at *19.

After independently reviewing the record, this Court finds that the California Supreme Court's denial of the ineffective assistance of counsel claim raised in claim 11 was not contrary to or an unreasonable application of clearly established Supreme Court authority.  Accordingly, claim 11 should be denied.

9.     Claim 12

Petitioner argues that trial counsel was ineffective for failing to impeach and investigate prosecution witness Keathley.  (ECF No. 9 at 22.)  At the outset, this Court observes that two of the arguments raised in claim 12 were raised in other claims.  In claim 12, petitioner argues that trial counsel was ineffective for failing to impeach Keathley with evidence of her criminal record.  (Id.)  Petitioner raised this argument in claim 7.  In claim 12, petitioner also argues that trial counsel failed to impeach Keathley with evidence that she lied about being with K.R. at the Sheriff's Office.  (Id.)  Petitioner raised this argument in claim 8.  Accordingly, this Court will not address these arguments again.

In claim 12, petitioner also argues that trial counsel was ineffective for failing to impeach Keathley's testimony that she was angry:

> Q: Okay.  You had an occasion—at some point, you formed the opinion that Mr. Aroz had molested T.L., right?
>
> A: Yes.
>
> Q: That angered you?  That upset you, didn't it?
>
> A: Yeah.

(ECF No. 34-2 at 282.)

Petitioner argues that trial counsel should have impeached Keathley's testimony that she

50

1  was angry with petitioner with the text messages Keathley sent to petitioner, addressed in the

2  court's discussion of claim 7, where Keathley referred to petitioner as "sweetie" and "friend."

3  (ECF No. 9 at 22.)

4      The cross-examination set forth above was part of trial counsel's cross-examination of

5  Keathley regarding her delay in reporting K.R.'s statement that petitioner admitted molesting T.L.

6  As set forth in the discussion of claim 7, trial counsel went on to elicit testimony from Keathley

7  that she waited roughly seven months after K.R. told her about petitioner's admission before

8  reporting it to law enforcement.  By eliciting Keathley's admission that she delayed reporting

9  K.R's statement, trial counsel sought to undermine the credibility of Keathley's testimony that

10  K.R. made this statement to her.  Keathley's admission of her delay in reporting K.R.'s statement

11  also undermined the credibility of Keathley's testimony that she was angry with petitioner for

12  molesting T.L.  As discussed above, the jury heard other impeachment evidence against Keathley,

13  including evidence of her prior criminal record.  This Court finds that there is no reasonable

14  probability that the outcome of the trial would have been different had Keathley's testimony

15  regarding her anger with petitioner been further impeached with the at-issue texts.

16      In claim 12, petitioner also argues that trial counsel failed to impeach Keathley's

17  testimony that petitioner told her "not to talk to anyone" while they were inmates in the Amador

18  County Jail together.  (Id. at 22.)  This court first discusses the background to this argument.

19      At trial, Keathley testified that while she and petitioner were in the Amador County Jail,

20  petitioner asked her if she had talked to anybody.  (ECF No. 34-2 at 280.)  Keathley testified that

21  she did not respond because she would get in trouble if she did.  (Id.)  Keathley also testified that

22  on another occasion, petitioner told her not to talk to anybody.  (Id.)  On cross-examination, trial

23  counsel asked Keathley if anybody else was within earshot at the time petitioner told her not to

24  talk to anybody.  (Id. at 288.)  Keathley responded that Kevin Gilliam, Stacy Dalton and Rachel

25  Delphin were there.  (Id. at 288-89.)

26      Petitioner argues that if trial counsel had conducted a proper investigation, he would have

27  discovered that it was impossible for Keathley and petitioner to have spoken to each other

28  without a correctional officer being present because female inmates in the jail are under escort

1   when they leave their housing unit.  (ECF No. 9 at 22-23.)  Petitioner also argues that inmates

2   Gilliam, Dalton and Delphin could not corroborate Keathley's testimony that they were present

3   when petitioner told Keathley not to talk to anybody.  (Id. at 23.)  Petitioner argues that trial

4   counsel was ineffective for failing to interview inmates Gilliam, Dalton and Delphin.  (Id.)

5         Petitioner cites exhibits I2-I3 in support of his claim that inmates Gilliam, Dalton and

6   Delphin were not present when Keathley claimed petitioner told Keathley not to talk to anybody.

7   (Id.)  Exhibit I2 is a subpoena addressed to Delphin prepared by trial counsel.  (Id. at 68.)  This

8   subpoena alone does not demonstrate that Delphin could have testified that she was not present

9   when petitioner told Keathley not to talk to anybody.  For this reason, this Court finds that

10   petitioner fails to demonstrate that trial counsel was ineffective for failing to interview Delphin.

11         Petitioner presents no evidence demonstrating that Gilliam could have testified that he

12   was not present when petitioner told Keathley not to talk to anybody.  For this reason, this Court

13   finds that petitioner fails to demonstrate that trial counsel was ineffective for failing to interview

14   Gilliam.

15         Exhibit I3 is a subpoena addressed to Dalton prepared by trial counsel.  (Id. at 69.)  Also

16   attached to exhibit I3 is a report prepared by Detective Peckinpaugh of his interview with Dalton.

17   (Id. at 70-71.)  The report states that Detective Peckinpaugh spoke with Dalton regarding

18   petitioner's case and memories she may have regarding former inmate Keathley.  (Id. at 71.)

19   Dalton stated that she shared the same cell block with Keathley during December 2015, who

20   spoke with her occasionally about petitioner.  (Id.)  Keathley told Dalton what petitioner was

21   accused of doing.  (Id.)  Dalton spoke with petitioner two times during transport from court and

22   "one of his statements coincided with what Keathley had mentioned."  (Id.)

23         Detective Peckinpaugh asked Dalton if she recalled any incident when there was dialogue

24   between petitioner and Keathley or any time he tried to get Keathley's attention.  (Id.)  Dalton

25   said she believed that Keathley mentioned that petitioner attempted to speak with her when she

26   was getting medicine.  (Id.)  Dalton recalled walking to a program one time with Keathley and

27   she heard petitioner talking.  (Id.)  She did not hear what he said.  (Id.)  Dalton said she could not

28   recall if Keathley responded.  (Id.)  Detective Peckinpaugh asked if Dalton saw where petitioner

1   was standing and she said no, she only knew he was inside F block.  (Id.)

2         Detective Peckinpaugh asked Dalton if she had any other contact with petitioner in the jail

3   other than during transport from court.  (Id. at 71.)  Dalton stated on a previous transport together,

4   shortly after Keathley was released on Sheriff's Parole, petitioner told her that the statement

5   Keathley provided would benefit him.  (Id.)

6         This Court finds that Dalton's statements to Detective Peckinpaugh do not contradict

7   Keathley's testimony that Dalton was within earshot when petitioner spoke to Keathley.  Dalton

8   told Detective Peckinpaugh that she was with Keathley when petitioner spoke, but Dalton did not

9   hear what petitioner said and could not recall if Keathley responded.  This statement does not

10  contradict Keathley's testimony that Dalton was near when petitioner spoke to Keathley.

11  Accordingly, petitioner's claim that trial counsel was ineffective for failing to interview Dalton is

12  without merit.

13        This Court also finds that petitioner fails to demonstrate that trial counsel was ineffective

14  for failing to present evidence that male and female inmates in the Amador County Jail can only

15  talk to each other in the presence of correctional officers.  The presence of correctional officers

16  does not necessarily mean that petitioner did not tell Keathley not to talk to anyone.  In addition,

17  Detective Peckinpaugh's report reflects that petitioner spoke to both Dalton and Keathley while

18  incarcerated at the jail.  For these reasons, this claim of ineffective assistance of counsel is

19  without merit.

20        After independently reviewing the record, this Court finds that the California Supreme

21  Court's denial of the ineffective assistance of counsel claims raised in claim 12 was not contrary

22  to or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

23  claim 12 should be denied.

24                  10.    Claim 13

25        Petitioner argues that trial counsel was ineffective for failing to object to a jury instruction

26  regarding the prosecution's burden to prove when the offenses occurred.  (ECF No. 9 at 24.)  In

27  support of this claim, petitioner cites California Penal Code § 955.  (Id.)  Petitioner also argues

28  that trial counsel failed to request an unanimity instruction.  (Id.)

This Court first addresses petitioner's claim that trial counsel failed to object to the jury instruction regarding the prosecution's burden to prove when the offenses occurred. The at-issue instruction read to the jury, CALCRIM No. 207, provided,

> It is alleged in this case that the crimes occurred on or about March 13th, 2015, and on March 17, 2015. The People are not required to prove that the crime took place exactly on that date, but only that it happened reasonably close to that day.

(ECF No. 34-3 at 82.)

Section 955 of the California Penal Code states,

> The precise time at which the offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing thereof, except where the time is a material ingredient in the offense.

Cal. Penal Code § 955.

Petitioner argues that, in light of California Penal Code § 955 and his alibi defense based on the time of the March 14, 2015 assault, trial counsel should have objected to CALCRIM No. 207.

Citing People v. Jennings, 53 Cal.3d 334, 358 (1991), respondent correctly observes that § 955 describes the notice that a prosecutor must provide a defendant so that he may adequately defend against the charges; it does not describe a prosecutor's burden of proof. In Jennings, the California Supreme Court observed that in People v. Barney, 143 Cal. App. 3d 490 (1983), the appellate court did not hold that the information must plead the exact date of the offense. Jennings, 53 Cal.3d at 358 (citing Barney, 143 Cal. App. 3d at 497). Barney held that "when the prosecution's proof establishes the offense occurred on a particular day to the exclusion of other dates, and when the defense is alibi (or lack of opportunity), it is improper to give the jury an instruction using the 'on or about language.'" Jennings, 53 Cal.3d at 359 (quoting Barney, 143 Cal. App. 3d at 497).

Respondent is correct that an objection by trial counsel to CALCRIM No. 207 based on California Penal Code § 955 would have been without merit because § 955 addresses the notice required in an accusatory pleading. Section 955 does not concern jury instructions.

54

In the instant action, the prosecution presented evidence that the first incident occurred in the early morning hours of March 14, 2015 and petitioner raised an alibi defense as to this incident.  Accordingly, this Court considers whether trial counsel was ineffective for failing to object, pursuant to <u>Barney</u>, to the "on or about" language of CALCRIM No. 207 as it applied to the first incident.

The undersigned agrees with respondent that petitioner was not prejudiced by trial counsel's failure to object to the "on or about" language in CALCRIM No. 207, as it applied to the first incident, because this instruction did not interfere with petitioner's alibi defense.  There was no dispute that the first incident was alleged to have occurred in the early hours of March 14, 2015.  Petitioner's alibi defense was that he was not at home when the first incident occurred.  The undersigned agrees with respondent that the trial evidence and closing arguments placed petitioner's March 14, 2015 alibi squarely before the jury, and the challenged instruction did not unfairly sway the jury in determining whether petitioner had the ability to assault T.L. that morning.  Accordingly, petitioner's ineffective assistance of counsel claim on these grounds is without merit because there is no reasonable probability that the outcome of the trial would have been different had the trial court granted an objection by trial counsel to CALCRIM No. 270 pursuant to <u>Barney</u>.

This Court next considers whether trial counsel was ineffective for failing to request an unanimity instruction.  During discussion of the proposed jury instructions, the court and counsel addressed whether an unanimity instruction should be read:

> Court: I don't believe the unanimity instruction is applicable in this case because I haven't heard that.  I heard evidence of each distinct act.  I haven't heard that the prosecution is relying on a bunch of acts and during the span of time.  I heard the distinct acts as set forth in the information.
>
> Trial Counsel: Yes.
>
> Court: So I don't believe the unanimity instruction would be applicable in this case.
>
> Trial Counsel: I agree that it is specific acts.
>
> Trial Counsel: Yeah.

1                 Prosecutor: Defined acts.

2                 Trial Counsel: I agree.  If you look at CalCrim 3501, it says, when generic testimony of defense is presented.  It wasn't generic.  It was

3                 –

4                 Court: It was absolute.  And the unanimity is not applicable because each count is delineated.  And there was evidence on each count,

5                 so…

6                 Trial Counsel: Okay.

7                 Court: I am not going to give the unanimity instructions on 3500 or 3501.  Any opposition to that?

8                 Trial Counsel: No.  I think the Court is right.

9                 Court: 3502, will not be given.

10 (ECF No. 34-3 at 61-62.)

11      In his motion for a new trial, petitioner identified CALCRIM No. 3500 as the unanimity

12 instruction that should have been read.  (ECF No. 34-6 at 244.)  CALCRIM No. 3500 provides,

13                 The defendant is charged with _____  <insert description of an

14                 alleged offense> [in Count _____] [sometime during the period of _____ to _____].

15                 The People have presented evidence of more than one act to prove

16                 that the defendant committed this offense.  You must not find the defendant guilty unless you all agree that the People have proved that

17                 the defendant committed at least one of these acts and you all agree on which act (he/she) committed.

18      In denying the motion for a new trial based on the failure to instruct on unanimity, the trial

19 court stated:

20

21                 Issue five as it relate [sic] to the unanimity instruction as to which sex act applied to which count, the Court thoroughly discussed the

22                 unanimity instruction with the parties.  The parties agreed that the unanimity instruction was not necessary.  There was distinct evidence of each specific count, including date and time.  There was

23                 no generic testimony.  The Court did not find the jury could otherwise disagree which act the defendant committed yet convict of

24                 a crime not charged or charged.  The Court provided the jury instruction 3515 which told the jury each count is a separate crime.

25                 The Court also relies on People versus Beardslee, a 1991 case, 53 Cal.3d at 68.  "The acts being substantially identical in nature

26                 does not require a unanimity instruction."  Therefore, the Court denies issue five as well.

27

28 (ECF No. 34-3 at 183.)

56

1    An unanimity instruction is appropriate when conviction on a single count could be based

2    on two or more discrete criminal events.  People v. Russo, 25 Cal.4th 1124, 1135 (2001) (internal

3    citation omitted).  "In deciding whether to give the instruction, the trial court must ask whether

4    (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular

5    crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as

6    to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not

7    the second, it should give the unanimity instruction."  Id.

8    As correctly found by the trial court, the counts against petitioner were each based on

9    single, discrete crimes.  Count 1 alleged that on March 17, 2015, petitioner committed a forcible

10   lewd act upon a child.  (ECF No. 34-6 at 43.)  In closing argument, the prosecutor argued that

11   Count 1 was based on the March 17, 2015, incident where petitioner pulled T.L. into his lap and

12   rubbed a private part of her body.  (ECF No. 34-3 at 114.)

13   Count II alleged that on or about March 13, 2015, petitioner sexually penetrated using a

14   foreign object a victim who was under the age of 14 and more than ten years younger than

15   petitioner.  (ECF No. 34-6 at 44.)  In closing argument, the prosecutor argued that Count II was

16   based on the first incident where petitioner penetrated T.L. with his fingers.  (ECF No. 34-3 at

17   115.)

18   Count III alleged that on or about March 13, 2015, petitioner sexually penetrated a victim

19   who was unconscious.  (ECF No. 34-6 at 44.)  In closing argument, the prosecutor argued that

20   count III was based on the first incident where petitioner penetrated T.L. with his fingers while

21   she was asleep.  (ECF No. 34-3 at 115.)

22   Counts IV and V alleged that on or around March 13, 2015, petitioner committed lewd

23   acts upon a child.  (ECF No. 34-6 at 45.)  In closing argument, the prosecutor argued that Counts

24   IV and V were based on two different incidents:

25   These two counts, there are two different counts because the
     defendant started with the penetration of her vagina with his fingers,
26   and he got a little spooked.  He got up and he came back.  And he
     rubbed her body again.  Her buttocks again.  That is one of those
27   counts.

28   He got up again.  And when he came back, a little more forcefully,

57

again rubbed that personal part of her body on her buttocks.  That is why we have different counts for different acts.

(ECF No. 34-3 at 116.)

The charges against petitioner and the prosecutor's closing argument make clear that the charges were based on single, discrete crimes.  For this reason, an unanimity instruction was not warranted.  Accordingly, trial counsel was not ineffective for failing to request an unanimity instruction.

After independently reviewing the record, this Court finds that the California Supreme Court's denial of the ineffective assistance of counsel claims raised in claim 13 was not contrary to or an unreasonable application of clearly established Supreme Court authority.  Accordingly, claim 13 should be denied.

11.    Claim 14

Petitioner argues that trial counsel was ineffective for making four false statements during his opening statement.  (ECF No. 9 at 25.)

a.    *Misstatement That Petitioner Walked From Buena Vista Bar to The Smokehouse*

Petitioner argues that trial counsel falsely stated in his opening statement that petitioner walked from the Buena Vista Bar to the Smokehouse Bar.  (Id. at 25.)  In his opening statement, trial counsel stated:

Let's start with the Friday the 13th incident.  You're going to hear evidence that Alex Aroz was at a bar called the Buena Vista Bar on the night of the 13th.  He had been drinking.  He walks from the Buena Vista Bar over to the Smokehouse Barbeque, because that's where [K.R.] worked.  They were boyfriend and girlfriend.

(ECF No. 34-6 at 210.)

In the traverse, petitioner clarifies that counsel's statement that petitioner walked from the Buena Vista Bar to The Smokehouse was false, citing Virginia Hill's statement to the investigator and her letter to "Judge," previously discussed in claim 7.  (ECF No. 38 at 33.)  According to Virginia Hill, she drove petitioner from the Buena Vista Bar to The Smokehouse.  (Id.)  Petitioner contends that it would have taken him all night to walk from the Buena Vista Bar to The

58

1    Smokehouse.  (Id. at 32-33.)

2            At trial, the jury did not hear direct evidence regarding how petitioner got from The Buena

3    Vista Bar to The Smokehouse.  However, K.R. testified that petitioner arrived at The

4    Smokehouse with his cousin, Virginia, at 7:00 p.m.  (ECF No. 34-2 at 70.)  K.R. testified that

5    after she got off work, she drove petitioner to pick up his Suburban at the Buena Vista Bar, which

6    was about a 30-to-40-minute drive.  (Id. at 71.)  From this testimony, the jury could have

7    reasonably inferred that Virginia Hill drove petitioner to The Smokehouse from The Buena Vista

8    Bar.

9            The trial court's instructions ensured that any purported misstatement of fact by trial

10   counsel in his opening statement did not affect the jury's verdict.  See Boyde v. California, 494

11   U.S. 370, 384 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do

12   instructions from the court.").  The jurors were instructed with CALCRIM No. 104, which stated,

13   in relevant part:

14                   Nothing that the attorneys say is evidence.  In their opening and
                    closing arguments, the attorneys will discuss the case, but their
15                   remarks are not evidence.  Their questions are not evidence.  Only
                    the witnesses' answers are evidence.
16

17   (ECF No. 34-6 at 136.)

18           The jury is presumed to have followed those unambiguous instructions.  Weeks v.

19   Angelone, 528 U.S. 225, 234 (2000).  Because the jury was instructed with CALCRIM No. 104,

20   which they are presumed to have followed, this Court finds that petitioner was not prejudiced by

21   trial counsel's misstatement in his opening statement that petitioner walked from the Buena Vista

22   Bar to The Smokehouse.  Accordingly, this claim of ineffective assistance of counsel is without

23   merit.

24                   b.      Misstatement That T.L.'s Bedroom Door Made Loud Noise

25           Petitioner argues that trial counsel falsely stated in his opening statement that it was T.L.'s

26   bedroom door that made the loud noise when opened and closed.  (ECF No. 9 at 25.)  Petitioner

27   argues that it was actually petitioner's door that made the loud noise.  (Id.)  In his opening

28   statement, trial counsel stated,

                                              59

> You'll further hear, I believe, through testimony that the door leading to TL's room squeaks.  You'll also find out this is a mobile home.  You have thin walls.  Hearing things is very easy.

(ECF No. 34-6 at 211-12.)

In her preliminary hearing testimony, read at trial, T.L. testified that the door to the bedroom K.R. and petitioner shared made a squeaky noise.  (ECF No. 34-2 at 46.)  T.L. testified there was no door in the room she stayed in.  (Id.)  K.R. testified that a blanket covered the door area in T.L.'s room.  (Id. at 73.)  K.R. also testified that the door to the bedroom she shared with petitioner stuck and was loud.  (Id. at 116.)  K.R. testified that she was able to hear that door whenever it opened.  (Id. at 117.)

In his opening statement, trial counsel incorrectly stated that the door to T.L.'s room squeaked.  However, the point of trial counsel's statement regarding the squeaky door, and his statement that the mobile home had thin walls, was to suggest that if petitioner molested T.L., someone would have heard it.  Moreover, as discussed above, the jury was instructed that an attorney's opening statement is not evidence.  The jury is presumed to have followed this instruction.  Weeks, 528 U.S. at 234.  For these reasons, this Court finds that petitioner was not prejudiced by trial counsel's misstatement regarding which door squeaked.  For these reasons, this claim of ineffective assistance of counsel is without merit.

### c.   Statement Regarding Text Message Evidence

Petitioner claims that trial counsel falsely told the jury that they would hear evidence that T.L. did not text her boyfriend after the March 14, 2015 incident.  (ECF No. 9 at 25.)  In his opening statement, the prosecutor said, "And after that TL went to the bathroom.  I think you'll hear evidence about how fearful she was and how she reached out with texting to her young boyfriend."  (ECF No. 34-6 at 203.)  In his opening statement, trial counsel said,

> The prosecutor alluded to the fact that on the 13th-14th incident. T.L. went to the bathroom, she sent out a text.  I anticipate there will be evidence by an expert in forensic texting that will say—well, first of all, let me back up.
>
> First, I believe the evidence will show that T.L. said, hey, the texting was done on the phone, AT&T, on my cell phone.
>
> You're going to hear evidence that, lo and behold, there is no record

60

1    of text messages on AT&T.

2    Then I think T.L. indicated, oh, wait a minute.  No, I—I texted my
     boyfriend on Facebook.

3

4    You will hear evidence, testimony, that there's no record of that on
     Facebook.  You'll find out that search warrants were written, data
     came back from both AT&T and Facebook, there was nothing.

5
     (ECF No. 34-6 at 213-14.)

6
          Petitioner argues that trial counsel failed to provide the promised evidence and testimony

7    that there was no record of text messages between T.L. and her boyfriend after the first incident.

8
          This Court first discusses the background to this claim.  At the preliminary hearing,

9    Detective Peckinpaugh testified that T.L. told him that the first incident occurred between 2:00

10   a.m. and 2:30 a.m.  (ECF No. 34-1 at 98.)  T.L. told Detective Peckinpaugh that she was able to

11   give the time because she attempted to contact her boyfriend while in the bathroom and saw that

12   the time on her phone was 2:31 a.m.  (Id.)  At the preliminary hearing, T.L. did not testify that she

13   texted her boyfriend after the first incident.

14
          As observed by respondent in the answer, prior to trial, both Facebook and AT&T sent

15   records in response to a subpoena and warrant.  (ECF No. 34-1 at 195, 204.)  Amador County

16   District Attorney Investigator Mike Martin prepared a report regarding his investigation of these

17   records.  (ECF No. 9 at 62-63.)  Martin's report stated that T.L.'s boyfriend, Lukas Smith, told

18   him that he had a chat conversation, using the Facebook Messenger application, with T.L. on

19   March 17, 2015 regarding "this incident."  (Id. at 62.)  Investigator Martin concluded that T.L.

20   and Lukas Smith communicated via Facebook Messenger beginning on September 12, 2014.  (Id.

21   at 63.)  "These conversations continued into 2015, in February, June, July, August and

22   September."  (Id.)  Martin stated that he found no record of the messenger conversations,

23   apparently because T.L. deleted her Facebook account which removed her from Lukas Smith's

24   friends list.  (Id.)

25
          After opening statements, T.L. told the court that she did not want to testify.  (ECF No.

26   34-1 at 269.)  Up until that point, the parties anticipated that T.L. would testify.  After finding

27   T.L. unavailable, the trial court informed the jury,

28
                                              61

1
2

> We started on time this morning.  A legal issue came up.  The Court had to actually hold a hearing, and the Court made a finding that a witness, the minor in this case, was unavailable for testimony.

3

> What this means, practically, is that the prosecution is going to introduce testimony at a prior hearing as the evidence.

4
5
6
7
8

> Since this occurred quickly, the parties haven't had time to prepare the transcript, and so there are certain legal issues that the Court has to deal with with the transcript after it gets prepared and what can and can't be read, et cetera.  And so I'm going to give the parties until 1:00 to do that, and we've been trying to figure out the most expedient and efficient way to do that with the least amount of impact on you.

9

> I do apologize for that, but sometimes in trial things will occur that the Court can't foresee, the parties can't foresee.  I do apologize.

10

(Id. at 283-84.)

11

        During trial, Deputy Coletti mentioned T.L.'s texts to her boyfriend in response to a

12

question by the prosecutor:

13
14

> Q:  Did she tell you what she did after the last time the defendant left the room?

15

> A:  Yes.  She stated she tried to text her boyfriend.

(ECF No. 34-2 at 161.)

16

        On cross examination, trial counsel asked Deputy Coletti about T.L.'s texts with her

17

boyfriend:

18
19
20

> Q: And she indicated to you at one point she attempted to text her boyfriend when she had retired to the bathroom after the incident of March 13th, March 14th?

21

> A: She told me she attempted to text her boyfriend.

22

> Q: Okay.  And did she identify the boyfriend?

23

> A: I don't believe I got his name.

24

> Q: Did she tell you what the nature of the text was?

25

> Prosecutor: Objection, hearsay.

(Id. at 165.)

26
27

        After a bench conference with the parties, the trial court sustained the prosecutor's

objection.  (Id.)  After excusing the jury, the trial court allowed trial counsel to address the

28

1   prosecutor's objection on the record.  Trial counsel told the court that "the door was open for the

2   defense to inquire into the area of whether or not TL texted her boyfriend.  The defense theory

3   being that it intended to call Investigator Mike Martin."  (Id. at 166.)  Trial counsel stated that

4   Martin would testify that he found no record of texting supporting the claims of T.L. and Lukas.

5   (Id. at 167.)  Trial counsel argued, "And the point is, when T.L. decided not to take the stand, my

6   client was robbed of his confrontation right.  And we are trying to do our best to substitute in

7   other ways to get around the problem."  (Id. at 169.)

8         The trial court ruled on the record that trial counsel could not bring in evidence addressing

9   whether T.L. texted her boyfriend following the first incident because T.L. did not testify at the

10  preliminary hearing regarding this matter:

11           The Court notes that whole purpose of the Martinez case is so that
             evidence is not admitted without the opportunity to be cross-
12           examined.  The Court notes also that at preliminary hearings, you can
             have hearsay evidence admitted either on a 115 basis primarily.
13
             So the Court look at this instance and says is this line of questioning
14           admissible.  And I think Martinez is determinative on that basis
             because that establishes the hearsay exception for this to come in at
15           the trial level.  Not at the preliminary hearing level.  And that is the
             purpose of Martinez, to keep things that were not adequately
16           examined and cross-examined at the prior hearing to come into
             evidence.
17
             So the Court would find that there is no hearsay exception that would
18           allow TL's statement to Deputy Peckinpaugh that was not discussed
             at the preliminary hearing examination to come in. The Court looked
19           at the preliminary hearing transcript.  The Court sat in on the
             preliminary hearing.  So it listened to the evidence this morning when
20           it was read in.

21           The Court doesn't find that TL ever addressed any line of questioning
             as it related to texting her boyfriend to establish any time frame.  So
22           the Court is going to not allow, and the Court did sustain the People's
             objection on that line of reasoning.
23

24  (Id. at 170-71.)

25        Trial counsel later asked, "And everything about [Lukas] Smith is out as I understand?"

26  (Id. at 178.)  The court responded, "Correct."  (Id.)  Detective Peckinpaugh, who testified after

27  Deputy Coletti, did not testify regarding statements made to him by T.L. concerning texts with

28  her boyfriend after the first incident.

63

1   　　　An attorney's broken promise to produce specific testimony may prejudice a defendant

2   where the promised witness was "key to the defense theory of the case" and the witness' absence

3   is unexplained.  Saesee v. McDonald, 725 F.3d 1045, 1044-50 (9th Cir. 2013); see also Mann v.

4   Ryan, 828 F.3d 1143, 1154 (9th Cir. 2016) (en banc) ("Several circuits have held that it may

5   violate Strickland for counsel to promise evidence in an opening statement and then fail to present

6   that evidence at trial.") (citing cases).

7   　　　However, "failing to present witnesses [or evidence] promised in an opening is not always

8   an error of a constitutional dimension."  Williams v. Bowersox, 340 F.3d 667, 671-72 (8th Cir.

9   2003); see also Soraich v. Montana, 264 Fed. App'x 654, 655 (9th Cir. 2008) (affirming denial of

10  ineffective assistance of counsel claim based on counsel's opening statement promise to the jury

11  and noting that cases do "not presume ineffective assistance of counsel based solely on a failure

12  to deliver promised testimony to the jury" but instead the cases "analyze[ ] the significance of the

13  failure in light of all of the circumstances"); Coleman v. Swarthout, 2013 WL 2156551, at *8

14  (E.D. Cal. May 17, 2013) ("[T]here is no rule that the failure of counsel to present evidence

15  promised in an opening statement is ineffective assistance of counsel per se.").

16  　　　"[I]n addressing whether a broken promise made during opening statements constitutes

17  ineffective assistance of counsel, courts have considered such factors as the significance of the

18  promised evidence, the nature of the promise, whether the failure to present the promised

19  evidence is due to unforeseen events, whether the evidence was presented to the jury in other

20  ways, and the length of time between the promise and presentation of the case to the jury."

21  Sedillo v. Lewis, 2014 WL 5456288, at *16 (C.D. Cal. Sept. 11, 2014), findings and

22  recommendations adopted by 2014 WL 5454311 (C.D. Cal. Oct. 22, 2014) (citing United States

23  ex rel. Hampton, 347 F.3d 219, 257 (7th Cir. 2003) (reneging on a promise to present evidence

24  "may be justified when 'unexpected developments ... warrant ... changes in previously announced

25  trial strategies.'  However, when the failure to present the promised testimony cannot be chalked

26  up to unforeseeable events, the attorney's broken promise may be unreasonable, for 'little is more

27  damaging than to fail to produce important evidence that had been promised in an opening.'"));

28  Ouber v. Guarino, 293 F.3d 19, 28 (1st Cir. 2002) ("When a jury is promised that it will hear the

defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered.  A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made."); <u>Anderson v. Butler</u>, 858 F.2d 16, 17 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening.  This would seem particularly so here when the opening was only the day before, and the jurors had been asked on the voir dire as to their acceptance of psychiatric testimony.  The promise was dramatic, and the indicated testimony strikingly significant."); <u>Williams v. Woodford</u>, 859 F. Supp. 2d 1154, 1170-73 (E.D. Cal. 2012) (defense counsel was ineffective in promising the jury that "key witnesses"—defendant and two eyewitnesses—would testify and then failing to fulfill that promise); <u>United States v. Crawford</u>, 680 F. Supp. 2d 1177, 1195-97 (E.D. Cal. 2009) ("Failure to produce a witness promised in opening statement may constitute ineffective assistance of counsel, if the promise was sufficiently 'specific and dramatic' and the evidence omitted would have been significant.... In contrast, where the promise is more general in nature, and/or where the testimony to be provided would not be significant or was elicited through other means, courts may defer to counsel's reasonable decision to change course.") (citation omitted)).

       In the instant case, the trial court denied trial counsel's request to present evidence regarding the text messages between T.L. and her boyfriend, including the testimony of Mike Martin because T.L. did not testify at trial and because T.L. did not testify regarding the text messages at the preliminary hearing.  The record is clear that T.L.'s failure to testify at trial was unforeseeable, and was a decision made <u>after</u> opening statements.  Based on this unforeseeable event, trial counsel was not ineffective for promising in his opening statement to call a witness, i.e., Mike Martin, to testify regarding text messages between T.L. and her boyfriend.  <u>See</u> <u>United States ex rel. Hampton</u>, 347 F.3d at 257 (failure to present promised testimony as a result of unforeseeable events is not ineffective assistance).  For these reasons, this claim of ineffective assistance of counsel is without merit.

                     d.      *Promise to Call The Smokehouse Custodian of Records and*
                             *Testimony from Debbie Zachary*

1    Petitioner argues that in his opening statement, trial counsel promised to call The

2 Smokehouse custodian of records and Debbie Zachary as witnesses but failed to do so.  (ECF No.

3 9 at 25.)  In his opening statement, trial counsel stated:

4           You're going to get testimony or a stipulation regarding the
            Smokehouse Barbeque custodian of records and testimony from
5           Debbie Zachary.

6           Let me put those two witnesses in context.  And I'll do it right after
            I show you this slide.
7

8 (ECF No. 34-6 at 210.)

9    Trial counsel did not further mention The Smokehouse custodian of records in his opening

10 statement.  Regarding Debbie Zachary, trial counsel went on to state,

11          They're getting ready to go to bed.  It's late.  Suddenly there's a
            knock on the door.  Debbie Zachary is at the door.  She works for the
12          Oaks Trailer Park.  She advises them that the light in [R.L.'s] vehicle
            I believe is on, will Mr. Aroz take care of that.  He does.  He comes
13          back.  [R.L.] at some point joins him in their bedroom.

14 (Id. at 211.)

15    In his opening statement, trial counsel did not describe the testimony he expected to elicit

16 from The Smokehouse custodian of records.  Given that trial counsel did not describe the

17 testimony he expected to elicit from The Smokehouse custodian of records, this claim of

18 ineffective assistance of counsel is without merit.  See Crawford, 680 F. Supp. 2d at 1195-97

19 (counsel's failure to follow through on general promise to call witness not unreasonable).

20    In his opening statement, trial counsel suggested that Debbie Zachary would testify that

21 she advised petitioner that the light in his vehicle was on.  At trial, Keathley testified that "[t]here

22 was somebody banging on the door because they had left the lights on inside of the truck."  (ECF

23 No. 34-2 at 272.)  Later, when asked who knocked on the door, Keathley answered, "A neighbor,

24 I don't know."  (Id. at 292.)

25    This Court finds that petitioner suffered no prejudice based on trial counsel's failure to

26 call Debbie Zachary as a witness because the testimony trial counsel suggested Debbie Zachary

27 would provide was elicited from Keathley.  Moreover, Debbie Zachary's proposed testimony as

28 described in the opening statement, i.e., that she knocked on the door to alert them that the light in

66

1  the truck was on, was not particularly crucial to petitioner's alibi defense.  See Crawford, 680 F.

2  Supp. 2d at 1197 ("[W]here the promise is more general in nature, and/or where the testimony to

3  be provided ... was elicited through other means, courts may defer to counsel's reasonable

4  decision to change course.") (citing United States v. McGill, 11 F.3d 223, 227 (1st Cir. 1993)

5  (counsel's failure to fulfill a promise to call a firearms expert that was general in nature was not

6  deficient performance where, in part, counsel elicited the evidence through other means)).

7       For the reasons discussed above, this court finds that this claim of ineffective assistance of

8  counsel is without merit.

9       *Conclusion*

10      After independently reviewing the record, this Court finds that the California Supreme

11  Court's denial of the ineffective assistance of counsel claims raised in claim 14 was not contrary

12  to or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

13  claim 14 should be denied.

14           12.     Claim 18

15      As discussed above, the prosecutor presented evidence of prior uncharged sexual

16  misconduct by petitioner involving victims R.B., A.T. and K.G.  Petitioner argues that trial

17  counsel was ineffective during closing argument when he conceded that petitioner committed

18  these prior bad acts.  (ECF No. 9 at 28.)  Petitioner argues that trial counsel talked him out of

19  testifying.  (Id.)  Petitioner argues that if he knew that trial counsel was going to admit that

20  petitioner committed the prior uncharged sexual misconduct, petitioner would have chosen to

21  testify and defend himself against the propensity evidence.  (Id.)  Petitioner also argues that trial

22  counsel was ineffective for failing to obtain K.G.'s prior testimony, which could have been used

23  to impeach her.  (Id.)

24      In the traverse, petitioner states that he "admits that at the age of 19 petitioner was

25  convicted for 'R.B.' and 'A.T.'  There is no argument for these two."  (ECF No. 38 at 35.)  Based

26  on this statement, it appears that in claim 18 petitioner only challenges trial counsel's concession

27  of the prior uncharged sexual misconduct involving K.G.  This Court first discusses the

28  background to this claim.

1    In closing argument, trial counsel stated,

2          We have had propensity evidence here.  We have had three young
           women say, hey, back—I think one was 2000.  That was [K.G.]  And
3          we had the two instances, [R.B.] and [A.T.]  It is hard to keep them
           straight because their names are so similar.  That happened in 2003
4          in Operation Care where my client did things.  That was, in [K.T.]'s
           case when he was 17.  With the other two cases, he was 19.  People
5          change.  It is evidence.  It is something he did.

6          Because you have to say it, there is nothing—we didn't even contest
           that.  That is something he did.  He is 32 now.  That is something he
7          did when he was 17 and 19.  That is a long time ago.  That does not
           necessarily indicate he had a propensity at the age of 32 to violate a
8          14-year-old girl.

9
10   (ECF No. 34-3 at 124.)

11        Prior to K.G.'s testimony, trial counsel asked the court if he could impeach K.G. with her

12   testimony from a prior criminal proceeding.  (ECF No. 34-2 at 246-48.)  The court denied this

13   request because trial counsel did not have the transcript from the prior proceeding.  (Id.)

14        In the traverse, petitioner refers to attachment 15 in support of claim 18.  (ECF No. 38 at

15   36.)  Attachment 15 is a letter to trial counsel from Haley Investigations.  (Id. at 38.)  The letter

16   states that Beverly Smith did not recall an incident at her home involving petitioner and K.G.

17   (Id.)  Also included in attachment 15 is a report addressing criminal proceedings against Chad

18   Hamilton and his alleged unlawful conduct with a person whose name is blacked out.  (Id. at 74.)

19   Petitioner appears to claim that K.G. is the person whose name is blacked out in the report, and

20   that this report demonstrates that K.G. lied in a prior criminal proceeding.

21        For the following reasons, this Court finds that petitioner was not prejudiced by trial

22   counsel's admission of petitioner's prior uncharged sexual misconduct involving K.G. and trial

23   counsel's failure to obtain evidence that could have been used to impeach K.G.  As discussed

24   above, R.B. and A.T. testified that petitioner had sexual contact with them when they were

25   minors.  Petitioner does not dispute this misconduct.  Amador County District Attorney

26   Investigator Sims testified that both R.B. and A.T. told him about petitioner's sexual contact with

27   them.  (ECF No. 34-2 at 219, 238-40.)  Investigator Sims testified that he spoke with petitioner

28   who admitted sexual contact with R.B. and A.T.  (Id. at 219-20, 240-41.)  Based on the strong

1    evidence of the prior uncharged sexual misconduct involving R.B. and A.T., there is no

2    reasonable probability that the outcome of the trial would have been different had trial counsel

3    successfully impeached K.G. and not conceded petitioner's prior uncharged sexual misconduct

4    involving K.G.  For these reasons, this claim of ineffective assistance of counsel is without merit.

5         After independently reviewing the record, this Court finds that the California Supreme

6    Court's denial of the ineffective assistance of counsel claim raised in claim 18 was not contrary to

7    or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

8    claim 18 should be denied.

9         In the discussion of claim 18 in the answer, respondent cites <u>McCoy v. Louisiana</u>, 584 U.S.

10   414 (2018) and <u>Florida v. Nixon</u>, 543 U.S. 174 (2004).  (ECF No. 35 at 56 n. 11.)  Although

11   petitioner does not appear to raise claims pursuant to <u>McCoy</u> and <u>Nixon</u>, in an abundance of

12   caution, this Court finds that were petitioner to raise claims pursuant to <u>McCoy</u> and <u>Nixon</u>, he

13   would not be entitled to relief.

14        In <u>Nixon</u>, a capital case, the Supreme Court considered the application of <u>United States v.</u>

15   <u>Cronic</u>, 466 U.S. 648 (1984) to a case where the lawyer conceded guilt to avoid the death penalty.

16   In <u>Cronic</u>, the Supreme Court held that ordinarily prejudice must be proved to prevail on

17   <u>Strickland</u>'s prejudice prong but is presumed in limited circumstances that are "so likely to

18   prejudice the accused that the cost of litigating their effect in a particular case is unjustified."

19   <u>Cronic</u>, 466 U.S. at 658.  In <u>Nixon</u>, the Supreme Court held that the lawyer's concession of guilt

20   as a strategy in avoiding the death penalty did not amount to a "'fail[ure] to function in any

21   meaningful sense as the Government's adversary,'" as required for a presumption of prejudice in

22   <u>Cronic</u>.  543 U.S. at 190 (quoting <u>Cronic</u>, 466 U.S at 666).

23        In <u>McCoy</u>, also a capital case, the Supreme Court held that the Sixth Amendment provides

24   a criminal defendant with the autonomy to decide the objective of his or her defense and "[w]hen

25   a client expressly asserts that the objective of '*his* defense' is to maintain innocence of the

26   charged criminal acts, his lawyer must abide by that objective and may not override it by

27   conceding guilt."  584 U.S. at 423 (citations omitted, italics in original).  The Supreme Court

28   concluded that "[b]ecause a client's autonomy, not counsel's competence, is in issue," neither the

                                              69

1   Strickland standard nor the Cronic standard apply.  Id. at 426.  Instead, "[v]iolation of a

2   defendant's Sixth Amendment-secured autonomy ranks as error of the kind [the Supreme Court

3   has] called 'structural'; when present, such an error is not subject to harmless-error review."  Id.

4   at 427.  Thus, under McCoy, "counsel may not admit her client's guilt of a charged crime over the

5   client's intransigent objection to that admission."  Id. at 426.

6        A claim alleging violation of the Sixth Amendment right to autonomy, as discussed in

7   McCoy, is based on a different legal theory than a claim alleging violation of the Sixth

8   Amendment right to adequate assistance of counsel.  See  Budd v. Baker, 2021 WL 148992, at *6

9   (D. Nev. Jan. 14, 2021).  Petitioner did not exhaust a claim pursuant to McCoy.

10       McCoy and Nixon-Cronic involved trial counsel's concession of the defendant's guilt to

11   criminal charges.[12]  In contrast, petitioner in the instant action challenges trial counsel's

12   concession of a prior uncharged act.  This Court is not aware of any clearly established Supreme

13   Court authority holding that trial counsel's admission of prior uncharged acts violates the Sixth

14   Amendment right to autonomy, discussed by the Supreme Court in McCoy, or results in

15   presumed prejudice, discussed by the Supreme Court in Nixon-Cronic.  Accordingly, petitioner

16   would not be entitled to habeas relief pursuant to McCoy or Nixon-Cronic.

17            13.   Claim 20

18        Petitioner argues that trial counsel was ineffective for failing to object to the testimony of

19   Dr. Urquiza regarding CSAAS.  (ECF No. 9 at 30.)  In support of this claim, petitioner cites State

20   v. G.E.P., 458 N.J. 436 (N.J. App. 2019).  (ECF No. 9 at 30.)

21   _____

22   [12]  Both McCoy and Nixon were capital cases.  The Ninth Circuit applied the Nixon holding in a
     non-capital case where the defendant's counsel conceded the defendant's guilt as to robbery in

23   order to "enhance his credibility" on counts where the evidence was somewhat less clear and the
     penalties greater.  United States v. Thomas, 417 F.3d 1053, 1058-59 (9th Cir. 2005).  Courts have

24   declined, however, to apply McCoy in non-capital cases.  See Ponce v. Eldridge, 2019 WL
     8501633, at *9 (C.D. Cal. Aug. 19, 2019), findings and recommendations adopted by 2020 WL

25   1904599 (C.D. Cal. Apr. 16, 2020) (citing United States v. Rosemond, 322 F. Supp. 3d 482, 486
     (S.D.N.Y. 2018) (case in which death penalty was not sought is "far apart" from McCoy); United

26   States v. Jose,  2018 WL 3747449, at *4 (E.D. Pa. Aug. 7, 2018) (distinguishing McCoy as a
     death penalty case on direct appeal, in contrast with the non-death-penalty habeas corpus case

27   before the district court); Yannai v. United States, 346 F. Supp. 3d 336, 347 (E.D.N.Y. 2018)
     (same)).

28

1    This Court agrees with respondent that petitioner intended to cite <u>State v. J.L.G.</u>, 234 N.J.

2    265 (2018) rather than <u>State v. G.E.P.</u>  In <u>State v. J.L.G.</u>, the New Jersey Supreme Court held that

3    expert testimony concerning CSAAS was admissible only as to delayed disclosure behaviors and

4    only if the evidence was "beyond the understanding of the average juror."  234 N.J. at 272.  In

5    <u>State v. G.E.P.</u>, cited by petitioner, the New Jersey Court of Appeal considered the retroactive

6    application of the holding in <u>State v. J.L.G.</u>  458 N.J. at 443.

7    As observed by respondent, California courts have rejected reliability challenges to

8    CSAAS evidence based on citations to <u>State v. J.L.G.</u>  <u>See</u> <u>People v. Nukida</u>, 2024 WL 1341036,

9    at *12 (Cal. App. 2024) ("…we find unpersuasive his reliance on out-of-state authority regarding

10   whether CSAAS evidence meets a <u>Kelly</u> (or <u>Frye</u>) requirement regarding general acceptance

11   within the scientific community."); <u>see also</u> <u>People v. Aguirre</u>, 2021 WL 4621859, at *3 (Cal.

12   App. 2021) ("Although a few courts have limited or questioned its admissibility …the 'vast

13   majority' of jurisdictions have approved the use of CSAAS evidence in criminal trials…This

14   includes California." (internal citation omitted)).

15   Because California courts reject the holding of <u>State v. J.L.G.</u>, an objection by trial

16   counsel to Dr. Urquiza's testimony regarding CSAAS based on <u>State v J.L.G.</u> would have been

17   meritless.  For this reason, trial counsel was not ineffective for failing to object on these grounds.

18   After independently reviewing the record, this Court finds that the California Supreme

19   Court's denial of the ineffective assistance of counsel claim raised in claim 20 was not contrary to

20   or an unreasonable application of clearly established Supreme Court authority.  Accordingly,

21   claim 20 should be denied.

22   **G.    Claim 15: Alleged Violation of Brady and Ineffective Assistance of Counsel**

23   Petitioner argues that the prosecutor committed misconduct by failing to disclose if

24   prosecution witness Keathley received any deal or compensation in exchange for her testimony,

25   in violation of <u>Brady</u>.  (ECF No. 9 at 26.)  Petitioner argues that trial counsel was ineffective for

26   failing to determine whether Keathley received any deal or compensation in exchange for her

27   testimony.  (<u>Id.</u>)

28   Petitioner's <u>Brady</u> claim is arguably procedurally defaulted because the Amador County

71

1    Superior Court implicitly denied this claim by citing In re Harris, 5 Cal.4th 813, 829 (1993) and

2    In re Dixon, 41 Cal.2d 756, 759 (1953).  (ECF No. 34-21.)  As previously discussed, Harris and

3    Dixon signal that the court denied a claim on the grounds that it could have been raised on direct

4    appeal but was not.  Thomas, 2023 WL 7093736, at *10.  The Supreme Court held that a claim

5    barred by Dixon is subject to procedural default.  Johnson, 578 U.S. at 609.  Respondent does not

6    argue that petitioner's Brady claim is procedurally barred.

7           This Court considers the merits of petitioner's Brady claim because the issue on the merits

8    of this claim is clear, and it is not clear whether this claim is procedurally barred.  See Lambrix,

9    520 U.S. at 524-25.   Because it is not clear whether any state court reviewed the merits of

10   petitioner's Brady claim, in an abundance of caution, this Court conducts a de novo review of this

11   claim.  See Stanley, 633 F.3d at 860.

12          Petitioner raised the ineffective assistance of counsel claim raised in claim 15 in his

13   second habeas corpus petition filed in the California Supreme Court.  (ECF No. 34-30 at 19.)

14   Because no state court issued a reasoned decision addressing this claim, this court independently

15   reviews the record to determine whether petitioner is entitled to habeas relief.   Stanley, 633 F.3d

16   at 853.

17               1.      Brady Claim

18            In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held "the suppression

19   by the prosecution of evidence favorable to an accused ... violates due process where the evidence

20   is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

21   prosecution."  To constitute a Brady violation, the Supreme Court has set forth a three-part test:

22   (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching;

23   (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and

24   (3) prejudice must have ensued.  Banks v. Dretke, 540 U.S. 668, 691 (2004).

25          "When the reliability of a given witness may well be determinative of guilt or innocence,

26   nondisclosure of evidence affecting credibility falls within this general rule."  Giglio v. United

27   States, 405 U.S. 150, 154 (1972) (citing Napue v. Illinois, 360 U.S. 264, 269 (1959)).  In that

28   regard, "[e]vidence of a deal or promise of lenient treatment in exchange for a witness's

1   testimony against a defendant may constitute evidence that must be disclosed under <u>Brady</u> and

2   <u>Napue</u>."  <u>Hovey v. Ayers</u>, 458 F.3d 892, 916 (9th Cir. 2006).

3          Petitioner speculates about the possibility of an undisclosed agreement between the

4   prosecution and witness Keathley.  Petitioner provides no evidence of this agreement.

5   Petitioner's speculation is insufficient to demonstrate a <u>Brady</u> violation.  See <u>United States v.</u>

6   <u>Kerr</u>, 709 Fed. Appx. 431, 434 (9th Cir. 2017) (speculation about the possibility of an undisclosed

7   leniency agreement between the Government and defendants' lawyer does not demonstrate

8   violation of <u>Brady</u>) (citing <u>Runningeagle v. Ryan</u>, 686 F.3d 758, 769-70 (9th Cir. 2012)

9   (explaining that "to state a <u>Brady</u> claim, [a petitioner] is required to do more than 'merely

10   speculate'" about defense value of withheld evidence) (quoting <u>Wood v. Bartholomew</u>, 516 U.S.

11   1, 6 (1995)).

12          Having conducted a de novo review of the record, this Court finds that petitioner's <u>Brady</u>

13   claim is without merit.

14                    2.       <u>Ineffective Assistance of Counsel Claim</u>

15          Petitioner's related ineffective assistance of counsel claim also fails because petitioner

16   fails to demonstrate the existence of an agreement between the prosecutor and Keathley in

17   exchange for her testimony.  Petitioner's speculation that such an agreement may have existed,

18   and that trial counsel was ineffective for failing to discover this agreement, is insufficient to

19   demonstrate ineffective assistance of counsel.  See <u>Witzig</u>, 2022 WL 19395289, at *19.  Having

20   independently reviewed the record, this Court finds that the California Supreme Court's denial of

21   this ineffective assistance of counsel claim was not contrary to or an unreasonable application of

22   clearly established Supreme Court authority.  Accordingly, this claim should be denied.

23          **H.  Claim 16: Trial Court's Alleged Error in Denying Defense Request to**

24              **Mike Martin as Witness**

25          Petitioner argues that the trial court abused its discretion when it denied trial counsel's

26   request to call Mike Martin as a witness.  (ECF No. 9 at 26.)  Respondent reasonably construes

27   claim 16 to allege a violation of the right to present a defense.  Accordingly, this Court considers

28   whether the trial court's denial of trial counsel's request to call Mike Martin as a witness violated

1  petitioner's right to present a defense.

2              1.      Legal Standard

3          The constitutional right to "a meaningful opportunity to present a complete defense" is

4  rooted in both the Due Process Clause and the Sixth Amendment.  Crane v. Kentucky, 476 U.S.

5  683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)); see Chambers v.

6  Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process

7  is, in essence, the right to a fair opportunity to defend against the State's accusations.");

8  Washington v. Texas, 388 U.S. 14, 19 (1967) ("The [Sixth Amendment] right to offer the

9  testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to

10  present a defense, the right to present the defendant's version of the facts as well as the

11  prosecution's to the jury so it may decide where the truth lies.").

12          This right, however, is not absolute.  "[S]tate and federal rulemakers have broad latitude

13  under the Constitution to establish rules excluding evidence from criminal trials."  United States

14  v. Scheffer, 523 U.S. 303, 308 (1998).  "Such rules do not abridge an accused's right to present a

15  defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed

16  to serve.'"  Id. (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).  Generally, the exclusion of

17  evidence is unconstitutional when it "significantly undermine[s] fundamental elements of the

18  defendant's defense."  Id. at 315.  But "well-established rules of evidence permit trial judges to

19  exclude evidence if its probative value is outweighed by certain other factors such as unfair

20  prejudice, confusion of the issues, or potential to mislead the jury."  Holmes v. South Carolina,

21  547 U.S. 319, 326 (2006).

22          "Only rarely" has the Supreme Court "held that the right to present a complete defense

23  was violated by the exclusion of defense evidence under a state rule of evidence."  Nevada v.

24  Jackson, 569 U.S. 505, 509 (2013) (per curiam).  In Jackson, the Supreme Court identified four

25  cases where it had found such a violation: (1) Holmes v. South Carolina, 547 U.S. 319 (2006)

26  (state rule that prohibited evidence of third-party guilt did not rationally serve any discernible

27  purpose); (2 Rock v. Arkansas, 483 U.S. 44 (1987) (state rule that prohibited defendant from

28  testifying post-hypnosis was arbitrary); (3) Chambers v. Mississippi, 410 U.S. 284 (1973) (trial

74

1    judge excluded witness testimony that another witness made trustworthy, inculpatory statements

2    on the night of the crime, and the state did not even attempt to explain the reason for its rule); and

3    (4) <u>Washington v. Texas</u>, 388 U.S. 14 (1967) (state rule prohibited accomplices and accessories

4    in the same crime from testifying for each other and could not be rationally defended).  <u>Jackson</u>,

5    569 U.S. at 509.  In <u>Jackson</u>, the Supreme Court upheld the application of a state rule excluding

6    extrinsic evidence for impeachment of a witness.  <u>Jackson</u>, 569 U.S. at 509-10.

7            The Supreme Court has not "squarely addressed" whether an evidentiary rule requiring a

8    trial court to balance factors and exercise its discretion" to exclude evidence violates a

9    defendant's right to present a complete defense.  <u>Sherman v. Gittere</u>, 92 F.4th 868, 880 (9th Cir.

10   2024) (quoting <u>Moses</u>, 555 F.3d at 758).  Therefore, a habeas petitioner cannot maintain that the

11   discretionary exclusion of evidence warrants federal habeas relief under clearly established

12   federal law.  <u>Moses</u>, 555 F.3d at 757-60.  The Supreme Court has not established a "controlling

13   legal standard" to evaluate discretionary decisions involving such evidence.  <u>Id.</u> at 758-59.

14                    2.      <u>Analysis</u>

15           The background to claim 16 is set forth in the discussion of petitioner's related ineffective

16   assistance of counsel claim raised in claim 14.  As set forth in the discussion of claim 14, the trial

17   court denied trial counsel's request to call Mike Martin to testify regarding his investigation into

18   whether T.L. texted with her boyfriend following the first incident because T.L. did not testify

19   regarding this matter in the preliminary hearing.  As discussed in more detail above, this ruling

20   was correct because T.L. did not testify about exchanging text messages with her boyfriend at the

21   preliminary hearing and at trial, T.L.'s preliminary hearing testimony was presented to the jury.

22           The trial court also implicitly rejected trial counsel's argument that the prosecutor

23   "opened the door" to evidence regarding these text messages when Deputy Coletti mentioned the

24   text messages in response to one of the prosecutor's questions:

25                    Q:  Did she tell you what she did after the last time the defendant left
                      the room?
26
                      A:  Yes.  She stated she tried to text her boyfriend.
27
                      Q:  Okay.  Did she go anywhere in the residence?
28

                                          75

1    A:  Yes, she did.  She explained that she had went to the bathroom.

2    Q:  When she went to the bathroom, did she notice anything unusual?

3    A:  Yes, she indicated that she had discharged a little bit of blood
     when she went to the bathroom.

4    (ECF No. 34-2 at 161.)

5    The trial court did not expressly address on the record the reasoning behind its ruling that

6    Deputy Coletti's testimony did not "open the door" to introduction of evidence regarding the at-

7    issue text messages.  However, this Court observes that California Evidence Code § 1202

8    provides for impeachment of hearsay statements by a declarant who does not testify at trial.

9    However, T.L.'s statement (admitted through Deputy Coletti's testimony) that she tried to text her

10   boyfriend after the first incident was not hearsay because it was not offered for the truth of the

11   matter.  Cal. Evid. Code § 1200(a) (hearsay evidence is evidence of a statement that was made

12   other than by a witness while testifying at the hearing and that is offered to prove the truth of the

13   matter stated).  Rather, Deputy Coletti provided T.L.'s statement regarding texting her boyfriend

14   in the context of his explanation regarding what T.L. did after the first incident, i.e., she went to

15   the bathroom.  Because T.L.'s statement regarding texting her boyfriend was not hearsay, the trial

16   court could have found that Deputy Coletti's testimony did not "open the door" to the

17   introduction of evidence impeaching T.L.'s statement that she tried to text her boyfriend.

18   In any event, in both rulings by the trial court denying trial counsel's request to call Mike

19   Martin as a witness, i.e., the text message evidence was not admissible because T.L. did not

20   testify about the text messages at the preliminary hearing and Deputy Coletti's testimony did not

21   "open the door" to introduction of the text message evidence, the trial court exercised its

22   discretion.  See People v. Price, 1 Cal.4th 324, 412 (1991) (trial court has discretion to exclude

23   impeachment evidence, including a prior inconsistent statement, if it is collateral, cumulative,

24   confusing, or misleading); People v. Waidla, 22 Cal.4th 690, 717-18 (2000) (a trial court's ruling

25   on the admissibility of evidence is generally reviewed for abuse of discretion).  Because the

26   Supreme Court has not "squarely addressed" whether an evidentiary rule requiring a trial court to

27   balance factors and exercise its discretion to exclude evidence violates a defendant's right to

28   present a complete defense, petitioner cannot show that the denial of trial counsel's request to call

76

1   Mike Martin as a witness violated clearly established Supreme Court authority.  See Sherman, 92

2   F.4th at 880.

3        To the extent petitioner could argue that the preparation of Mike Martin's report after the

4   preliminary hearing violated his right to confront T.L. at the preliminary hearing, the Ninth

5   Circuit rejected a similar claim in Gibbs v. Covello, 996 F.3d 596 (9th Cir. 2021):

> Second, we consider those questions defense counsel were unable to
> ask because the prosecution's disclosures about Feissa came only
> after the preliminary hearing.  Gibbs and Khalill do not argue that the
> timing of the disclosures violated the rule of Brady v. Maryland, 373
> U.S. 83 (1963), and they do not explain why the timing of the
> prosecution's disclosures is relevant to the Sixth Amendment issue
> presented here.  Still less do they point to any "clearly established
> Federal law, as determined by the Supreme Court of the United
> States" supporting their position. 28 U.S.C. § 2254(d)(1).  To the
> contrary, a plurality of the Supreme Court has stated that "[t]he
> ability to question adverse witnesses ... does not include the power to
> require the pretrial disclosure of any and all information that might
> be useful in contradicting unfavorable testimony."  Ritchie, 480 U.S.
> at 53 (plurality opinion); see Williams v. Bauman, 759 F.3d 630, 636
> (6th Cir. 2014); Martir v. Lizarraga, 183 F. Supp. 3d 1064, 1076
> (N.D. Cal. 2016).

15   996 F.3d at 605.[13]

16        After independently reviewing the record, this Court finds that the California Supreme

17   Court's denial of the claim raised in claim 16 was not contrary to or an unreasonable application

18   of clearly established Supreme Court authority.  Accordingly, claim 16 should be denied.

19        **I.   Claim 17: Alleged Violation of Brady and Ineffective Assistance of Counsel**

20        Petitioner argues a Brady violation based on the prosecution's alleged failure to disclose

21   audio and video content from the car driven by the CHP officer who stopped K.R. on the night

22   law enforcement first arrived at petitioner's residence.  (ECF No. 9 at 27.)  Petitioner also argues

23   that trial counsel was ineffective for failing to obtain the audio and visual content from the CHP

24   officer's car.  (Id.)

25   _____

26   [13] This Court also observes that at the preliminary hearing, Detective Peckinpaugh testified that
     T.L. told him that she was able to give the time of the first assault because she attempted to
27   contact her boyfriend while in the bathroom and saw that the time on her phone was 2:31 a.m.
     (ECF No. 34-1 at 98.)  Therefore, at the preliminary hearing, petitioner's counsel knew of T.L.'s
28   attempt to contact her boyfriend using her phone.

1    Petitioner's <u>Brady</u> claim is arguably procedurally defaulted for the same reasons as the

2    <u>Brady</u> claim raised in claim 15.  Accordingly, this Court considers the merits of petitioner's

3    <u>Brady</u> claim raised in claim 17 because the issue on the merits of this claim is clear and it is not

4    clear whether this claim is procedurally barred.  <u>See</u> <u>Lambrix</u>, 520 U.S. at 524-25.  Because it is

5    not clear whether any state court reviewed the merits of this claim, in an abundance of caution,

6    this Court conducts a de novo review.  <u>Stanley</u>, 633 F.3d at 860.

7    Petitioner raised the ineffective assistance of counsel claim raised in claim 17 in his

8    second habeas corpus petition filed in the California Supreme Court.  (ECF No. 34-30 at 20.)

9    Because no state court issued a reasoned decision addressing this claim, this court independently

10   reviews the record to determine whether petitioner is entitled to habeas relief.  <u>Stanley</u>, 633 F.3d

11   at 853.

12            1.    <u>Background</u>

13   Officer Zaragoza testified that after she pulled K.R. over for speeding, K.R. stated that she

14   received a text from her daughter saying that K.R.'s boyfriend touched her inappropriately.  (ECF

15   No. 34-2 at 145.)  While testifying, Officer Zaragoza referenced paperwork she identified as a

16   "415," which she described as a timesheet describing her activity for that night.  (<u>Id.</u> at 145-46.)

17   Officer Zaragoza gave trial counsel the 415 to review because it had not been provided in

18   discovery.  (<u>Id.</u> at 146.)  Officer Zaragoza testified that she made ink or pencil notations on the

19   415 after she reviewed the "in car camera."  (<u>Id.</u> at 146-47.)  Officer Zaragoza testified that she

20   had an audio and video recording of her conversation with K.R. from the stop.  (<u>Id.</u> at 146.)  Trial

21   counsel indicated that he was not aware of the audio and video recording from the stop.  (<u>Id.</u>)

22            2.    <u>Brady Claim</u>

23   As stated above, to constitute a <u>Brady</u> violation, the Supreme Court set forth a three-part

24   test: (1) the evidence must be favorable to the accused, either because it is exculpatory or

25   impeaching; (2) the prosecution must have withheld the evidence, either intentionally or

26   inadvertently; and (3) the evidence must be material to guilt or punishment.  <u>Banks</u>, 540 U.S. at

27   690.

28   This Court finds that petitioner fails to demonstrate that the audio and video recording of

78

1    Deputy Zaragoza's stop of K.R. was material to his guilt.  Petitioner's speculation that the video

2    and audio recording from Deputy Zaragoza's stop of K.R. contained evidence helpful to his

3    defense fails to demonstrate the materiality of this evidence.  <u>Runningeagle</u>, 686 F.3d at 769.

4         Having conducted a de novo review of the record, this court finds that petitioner's <u>Brady</u>

5    claim raised in claim 17 is without merit.  Accordingly, this claim should be denied.

6                        3.        <u>Ineffective Assistance of Counsel Claim</u>

7         Petitioner argues that trial counsel was ineffective for failing to obtain the audio and video

8    recording of Deputy Zaragoza's stop of K.R. prior to trial.  Petitioner does not claim that he,

9    petitioner, reviewed the at-issue audio and video recording.  Petitioner's conclusory and

10   unsupported claim that he was prejudiced by trial counsel's failure to obtain this evidence prior to

11   trial does not demonstrate prejudice under <u>Strickland</u>.  <u>See</u> <u>Witzig</u>, 2022 WL 19395289, at *19.

12        After independently reviewing the record, this Court finds that the California Supreme

13   Court's denial of the ineffective assistance of counsel claim raised in claim 17 was not contrary to

14   or an unreasonable application of clearly established Supreme Court authority.  Accordingly, this

15   claim should be denied.

16        **J.  Claim 19: Alleged Ineffective Assistance of Appellate Counsel**

17                        1.        <u>Legal Standard</u>

18        Claims of ineffective assistance of counsel on appeal are reviewed under a deferential

19   standard similar to that established for trial counsel ineffectiveness in <u>Strickland v. Washington</u>,

20   466 U.S. 668 (1984).  <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000).  Under this standard, a

21   petitioner challenging his appellate counsel's performance must demonstrate (1) counsel's

22   performance was unreasonable, which in the appellate context requires a showing counsel acted

23   unreasonably in failing to discover and brief a meritorious issue, and (2) there is a reasonable

24   probability, but for counsel's failure to raise the issue, the petitioner would have prevailed on his

25   appeal.  <u>Robbins</u>, 528 U.S. at 285-86.

26        The presumption of reasonableness is even stronger for appellate counsel because they

27   have wider discretion than trial counsel in weeding out weaker issues; doing so is widely

28   recognized as one of the hallmarks of effective appellate assistance.  <u>Miller v. Keeney</u>, 882 F.2d

1   1428, 1434 (9th Cir. 1989).  The exercise of professional judgment in framing appellate issues

2   makes it difficult to demonstrate counsel's omission of a particular argument was deficient

3   performance.  Robbins, 528 U.S. at 288.

4                2.      Analysis

5        Petitioner raised his ineffective assistance of appellate counsel claim in his second habeas

6   corpus petition filed in the California Supreme Court.  (ECF No. 34-30 at 23.)  Because no state

7   court issued a reasoned decision addressing this claim, this Court independently reviews the

8   record to determine whether petitioner is entitled to habeas relief.  Stanley, 633 F.3d at 853.

9        Petitioner argues that appellate counsel was ineffective for "fail[ing] to raise any of the

10  claims set above and refuses to work with [petitioner]."  (ECF No. 9 at 29.)  Petitioner argues that

11  petitioner "pointed out multiple issues that were objected to and are in the record for appellate

12  counsel to review and raise on appeal.  But counsel has refused to do anything or go to hearings

13  he filed motions on (see attachment 'A') and his refusal renders him [ineffective]."  (Id.)  The

14  only specific issue petitioner identifies in claim 19 that appellate counsel failed to raise on appeal

15  is a claim pursuant to People v. Marsden, 2 Cal.3d 118 (1970).  (Id.)  In Marsden, the California

16  Supreme Court established the procedure for seeking substitution of appointed counsel.  2 Cal.3d

17  at 123-26.

18       Attachment A to the petition includes indexes of documents related to petitioner's appeal,

19  a proposed settled statement regarding petitioner's appeal, an email from counsel Ninke to

20  petitioner's appellate counsel regarding the appointment of trial counsel Clark, an email from trial

21  counsel Clark to appellate counsel regarding Clark's appointment, emails between appellate

22  counsel and a deputy district attorney regarding the appointment of Clark, a notice of hearing on

23  the settled statement for petitioner's appeal, and a transcript from what appears to be a hearing

24  regarding the settled statement for petitioner's appeal.  (ECF No. 9 at 80-108.)

25       Petitioner also cites letters he received from appellate counsel, attached as exhibits G1-G-

26  5, in support of the instant claim.  (Id. at 29.)  In a letter dated September 2, 2020, appellate

27  counsel advised petitioner that he would cite a New Jersey case in support of his argument that

28  the CSAAS evidence was improperly admitted.  (Id. at 53.)  Appellate counsel also advised

1    petitioner that a claim regarding a <u>Brady</u> violation must be raised in a petition for writ of habeas

2    corpus.  (<u>Id.</u>)  In a letter dated September 3, 2020, appellate counsel advised that he could not

3    raise the New Jersey case, referred to in the letter dated September 2, 2020, because that issue

4    was not raised in the trial court.  (<u>Id.</u> at 54.)  In a letter dated September 5, 2020, appellate counsel

5    advised that he received petitioner's letter dated August 27, 2020 listing issues related to

6    petitioner's trial counsel.  (<u>Id.</u> at 55.)  Appellate counsel advised petitioner that the ineffective

7    assistance of counsel claims must be raised in a habeas corpus petition.  (<u>Id.</u>)  In a letter dated

8    February 11, 2019, appellate counsel addressed petitioner's February 2, 2019 letter stating that

9    appellate counsel was "purposely not trying to help" petitioner.  (<u>Id.</u> at 56.)  Appellate counsel

10    advised petitioner that appellate counsel raised all arguable issues.  (<u>Id.</u>)  Appellate counsel

11    advised petitioner that he could not raise issues outside of the transcripts on appeal.  (<u>Id.</u>)  In a

12    letter dated August 7, 2017, appellate counsel stated, in part, that he spoke with attorney Ninke

13    regarding petitioner's case.[14]  (<u>Id.</u> at 57.)

14        In the pending claim, petitioner appears to argue that appellate counsel was ineffective for

15    failing to raise all claims raised in the instant action and "multiple issues."  (<u>Id.</u> at 29.)  Appellate

16    counsel raised claims 1, 2 and 3 in the appeal.  Therefore, petitioner cannot argue that appellate

17    counsel was ineffective for failing to raise these claims.  Petitioner cannot show that appellate

18    counsel was ineffective for failing to raise the remaining claims raised in the instant action

19    because, for the reasons discussed above, these claims are without merit.  <u>See</u> <u>Wildman v.</u>

20    <u>Johnson</u>, 261 F.3d 832, 840 (9th Cir. 2001) (failing to raise meritless argument on appeal does not

21    constitute ineffective assistance of appellate counsel).[15]

22        Regarding petitioner's assertion that appellate counsel failed to raise "multiple issues" that

23    could arguably result in a reversal, petitioner fails to specify any other ground for relief other than

24    the <u>Marsden</u> claim.  Vague and conclusory allegations like these do not meet the specificity

25    [14]  This Court observes that the letters from appellate counsel to petitioner span a range of years.

26    [15]  This Court observes that appellate counsel correctly advised petitioner that claims based on evidence outside the record must be raised in habeas corpus proceedings.  <u>People v. Waidla</u>, 22

27    Cal.4th 690, 743-44 (2000); <u>People v. Anh The Duong</u>, 10 Cal.5th 36, 56 (2020) (when an ineffective assistance of counsel claim is based on evidence not in trial record, the claim must be

28    presented in a petition for writ of habeas corpus).

1   requirement.  See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (conclusory allegations

2   unsupported by a statement of specific facts do not warrant habeas relief); see also Blackledge v.

3   Allison, 431 U.S. 63, 75 n.7 (1977) ("the petition is expected to state facts that point to a real

4   possibility of constitutional error") (citation omitted) (internal quotation marks omitted).

5          Accordingly, this Court only considers whether appellate counsel was ineffective for

6   failing to raise the one claim identified in claim 19, i.e., the Marsden claim.  The record reflects

7   that the trial court considered one Marsden motion.

8          On May 24, 2016, after petitioner's trial and before sentencing, the trial court appointed

9   counsel Parish to investigate petitioner's request for a new trial based on claims of ineffective

10  assistance of counsel.  (ECF 34-3 at 159.)  On June 20, 2016, counsel Parish reported back to the

11  court that after conducting research, he found nothing that would meet the standard for ineffective

12  assistance of counsel.  (Id. at 162.)  At this hearing, trial counsel Clark informed the court that

13  petitioner had handed him a Marsden motion.  (Id. at 163.)  The court then conducted an in-

14  camera hearing regarding the Marsden motion.  (Id. at 164-65.)  The transcript from this in-

15  camera hearing is not in the court record.  (Id.)  Petitioner attached to his petition a partial

16  transcript from the in-camera hearing regarding his Marsden motion.  (ECF No. 9 at 132-33.)

17  Following the in-camera hearing, the court appointed counsel Parish to represent petitioner going

18  forward.  (ECF No. 34-3 at 166.)  Thus, it appears that the trial court granted petitioner's Marsden

19  motion.

20          Because the trial court granted petitioner's Marsden motion, the grounds for appellate

21  counsel to raise a claim pursuant to Marsden are not apparent.  Given that petitioner succeeded on

22  his Marsden motion before the trial court, this Court finds that appellate counsel was not

23  ineffective for failing to raise a Marsden claim on appeal.[16]

24          After independently reviewing the record, this Court finds that the California Supreme

25  Court's denial of petitioner's ineffective assistance of appellate counsel claim was not contrary to

26  or an unreasonable application of clearly established Supreme Court authority.   Accordingly, this

27

28  [16]  Because the record is clear that the trial court granted petitioner's Marsden motion, this Court
     need not review the entire transcript from the in-camera hearing addressing the Marsden motion.

1 claim should be denied.

2 **V.      CONCLUSION**

3       Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

4 habeas corpus be denied and the court decline to consider the new claim raised in the traverse.

5       These findings and recommendations are submitted to the United States District Judge

6 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7 after being served with these findings and recommendations, any party may file written

8 objections with the court and serve a copy on all parties.  Such a document should be captioned

9 "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

10 he shall also address whether a certificate of appealability should issue and, if so, why and as to

11 which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

12 applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

13 § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

14 service of the objections.  The parties are advised that failure to file objections within the

15 specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

16 F.2d 1153 (9th Cir. 1991).

17

18 Dated:  August 12, 2024

19

20                                                    CHI SOO KIM
                                                     UNITED STATES MAGISTRATE JUDGE

21 Aroz1934.157(3)

22 2

23

24

25

26

27

28

                                              83